UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT | ) | No. 15 B 1145 |
| OPERATING CO., INC., *et al.*, | ) | (Jointly administered) |
| | ) | |
| Debtors. | ) | |
| ——————————————— | ) | |
| | ) | |
| CAESARS ENTERTAINMENT | ) | |
| OPERATING CO., INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 15 A 149 |
| | ) | |
| BOKF, N.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | Judge Goldgar |

## MEMORANDUM OPINION

This adversary proceeding is before the court for ruling after an evidentiary hearing on the

motion of the debtors – Caesars Entertainment Operating Co., Inc. ("CEOC") and more than 170

of its subsidiaries – for a preliminary injunction under section 105(a) of the Bankruptcy Code, 11

U.S.C. § 105(a), to halt four civil actions against CEOC's non-debtor parent, Caesars

Entertainment Corp. ("CEC") in other courts.

The actions arise out of nearly $4.6 billion in second lien and senior unsecured notes that

CEOC issued and CEC guaranteed. The plaintiffs in the four actions – indenture trustees and

holders of the notes[1] – brought the actions after CEC claimed that two 2014 transactions

———————————————————

[1]      The plaintiffs are (1) Wilmington Savings Fund Society, FSB ("Wilmington"); (2)
BOKF, N.A. ("BOKF"); (3) MeehanCombs Global Credit Opportunities Master Fund, LP;
Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds Trust; SB 4 CF LLC;

involving CEC had released the guarantees. The actions seek damages from CEC for breach of

contract (among other things) as well as declaratory judgments that the guarantees are still in

effect. The debtors contend the actions should be enjoined because their prosecution threatens

the success of the debtors' chapter 11 cases. The plaintiffs in the four actions – defendants here –

oppose the debtors' request.

These are the court's findings of fact and conclusions of law pursuant to Rule 52(a)(2) of

the Federal Rules of Civil Procedure, Fed. R. Civ. P. 52(a)(2) (made applicable by Fed. R. Bankr.

P. 7052). Because the debtors have not shown they are entitled to the injunctive relief they

request, their motion will be denied.

## 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a)

and the district court's Internal Operating Procedure 15(a). This is a core proceeding under 28

U.S.C. § 157(b)(2)(A). *See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville

Corp.)*, 801 F.2d 60, 64 (2d Cir. 1986).

Two of the four defendants here, MeehanCombs and Danner, contest jurisdiction. They

contend a bankruptcy court lacks subject matter jurisdiction to enjoin proceedings in other courts.

They are mistaken. The grant of bankruptcy jurisdiction appears in section 1334 of Title

28 of the U.S. Code. Section 1334(a) confers on the district court original and exclusive

jurisdiction over all bankruptcy cases. 28 U.S.C. § 1334(a). Section 1334(b), in turn, confers on

the district court non-exclusive jurisdiction over proceedings "arising under title 11" as well as

---

CFIP Ultra Master Fund, Ltd.; and Trilogy Portfolio Co., LLC (collectively, "MeehanCombs");
and (4) Frederick Barton Danner, as representative of a plaintiff class ("Danner").

proceedings "arising in" or "related to" cases under title 11. 28 U.S.C. § 1334(b). Under section

157(a), district courts may refer those proceedings to the bankruptcy court. 28 U.S.C. § 157(a).

In referred matters (and in this district all matters are automatically referred), the bankruptcy

courts therefore exercise the jurisdiction of district court. *See generally Executive Benefits Ins.*

*Agency v. Arkison,* ___ U.S. ___, 134 S. Ct. 2165, 2171 (2014).

 The court has jurisdiction over this proceeding because it is one "arising under" Title 11.[2]

A proceeding "arises under" the Code if the claim in the proceeding is "created or determined by

a statutory provision of title 11." *Nelson v. Welch (In re Repository Techs., Inc.),* 601 F.3d 710,

719 (7th Cir. 2010); *Wood v. Wood (In re Wood),* 825 F.2d 90, 96 (5th Cir. 1987). The claim

here, a claim to enjoin civil actions in other courts, is created by section 105(a) of the Code. *See*

*Fisher v. Apostolou,* 155 F.3d 876, 882 (7th Cir. 1998); *In re L & S Indus., Inc.,* 989 F.2d 929,

932 (7th Cir. 1993); *In re Energy Coop., Inc.,* 886 F.2d 921, 929 (7th Cir. 1989). The proceeding

to decide that claim is therefore one over which the bankruptcy court has jurisdiction.[3]

---

[2]   MeehanCombs argues that the court lacks subject matter jurisdiction over the
claims in the actions themselves. But the debtors are not asking the court to assert jurisdiction
over those claims. They are asking the court to enjoin their continued prosecution. Jurisdiction
to do the one does not depend on jurisdiction to do the other. Ralph Brubaker, *Nondebtor
Releases and Injunctions in Chapter 11: Revisiting Jurisdictional Precepts and the Forgotten
Callaway v. Benton Case,* 72 Am. Bankr. L.J. 1, 44-45 (1998) ("A temporary status quo
injunction simply does not adjudicate the parties' underlying dispute. Thus, jurisdiction to
temporarily stay an action is not dependent upon jurisdiction to adjudicate the parties'
controversy."). In *Celotex Corp. v. Edwards,* 514 U.S. 300 (1995), the Court implicitly rejected
the dissent's view that if a bankruptcy court lacks jurisdiction to decide a claim, that court cannot
enjoin another court, a court plainly having jurisdiction, from deciding it. *See id.* at 323-24
(Stevens, J., dissenting).

[3]   The Court in *Celotex* concluded that the bankruptcy court had "related to"
jurisdiction over a request for a section 105 injunction. *Celotex,* 514 U.S. at 309. In doing so,
however, the Court left open the possibility that there might be "arising under" or "arising in"
jurisdiction. The Court acknowledged that possibility in passing and remarked: "We need not
and do not decide this question here. " *Id.* at 311 n.8.

Not only is there jurisdiction, but because the claim asserted is one "arising under" the

Code, the proceeding is also a "core" proceeding. *See* 28 U.S.C. § 157(b); *Stern v. Marshall*, \_\_\_

U.S. \_\_\_, \_\_\_, 131 S. Ct. 2594, 2603 (2011) (discussing the statutory definition of "core"

proceedings). Therefore, it is a proceeding in which the bankruptcy court can enter a final

judgment. *Johns-Manville*, 801 F.2d at 64 (stating that a section 105 injunction claim is core);

*Spiers Graff Spiers v. Menako (In re Spiers Graff Spiers)*, 190 B.R. 1001, 1008 (Bankr. N.D. Ill.

1996) (same); *Carabetta Enters., Inc. v. City of Asbury Park (In re Carabetta Enters., Inc.)*, 162

B.R. 399, 403 (Bankr. D. Conn. 1993) (same); *Gathering Rest., Inc. v. First Nat'l Bank of

Valparaiso (In Gathering Rest., Inc.)*, 79 B.R. 992, 997-98 (Bankr. N.D. Ind. 1987) (same);

*Rustic Mfg., Inc. v. Marine Bank (In re Rustic Mfg., Inc.)*, 55 B.R. 25, 29 (Bankr. W.D. Wis.

1985) (same); Brubaker, *supra*, 72 Am. Bankr. L.J. at 42-47.

MeehanCombs and Danner express particular concern over an Article I court enjoining

proceedings in an Article III court. They argue that such an injunction would be unconstitutional,

a separation of powers violation.

But they cite no decision reaching that conclusion, and there appears to be none. In

*Celotex*, the Court upheld a bankruptcy court's jurisdiction to enjoin proceedings in a federal

district court – an Article III court. *Celotex*, 514 U.S. at 309. The Court did so in the face of a

dissent complaining that "the majority attaches insufficient weight to the fact that the challenged

injunction was issued by a non-Article III judge . . . ." *Id.* at 313-14. The leading decision on

section 105 injunctions in this circuit, *Fisher v. Apostolou*, likewise affirmed a bankruptcy

court's injunction halting proceedings in a district court. *Fisher*, 155 F.3d at 878. The Supreme

Court in *Celotex* and the Seventh Circuit in *Fisher* evidently detected no separation of powers

problem. *See also In re A.H. Robins Co.*, 788 F.2d 994, 1003 (4th Cir. 1986) (declaring that

bankruptcy courts have jurisdiction to enjoin actions "in other courts, whether state or federal").[4]

Because the debtors' section 105 injunction claim is one "arising under" the Code (and at the very least is "related to" these bankruptcy cases), the court has jurisdiction to decide it. 28 U.S.C. § 1334(b).

## 2. Facts

The facts are drawn from the evidence adduced at the hearing and from the dockets in the bankruptcy cases. *See CLC Creditors' Grantor Trust v. Howard Sav. Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 738 n.5 (Bankr. N.D. Ill. 2008) ("The court can take judicial notice of its own docket entries.").

### a. CEC and the Debtors

The debtors in these jointly-administered chapter 11 cases are the primary operating units of a larger group of companies described as "the Caesars gaming enterprise" (collectively, "Caesars"). (MC Ex. 19 at 1).[5] The debtor in the lead case is CEOC; the debtors in the other cases are subsidiaries of CEOC. The majority owner of CEOC is CEC. (Tr. v. II at 148). CEC

---

[4]    With one exception, MeehanCombs and Danner base their argument entirely on decisions issued before *Celotex*, such as *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969 (N.D. Ill. 1992). The one exception is an unpublished decision, *In re Receivership Estate of Indian Motorcycle Mfg., Inc.*, No. CIV.A. 95-Z-777, 2002 WL 507543 (D. Colo. Feb. 28, 2002), that relied on *Mahurkar*. *Id.* at *1-2. Neither *Mahurkar* nor *Indian Motorcycle* mentioned separation of powers. And neither decision is relevant anyway. Each concerned a bankruptcy court's power to prevent a district court from deciding the effect of the automatic stay on the action before it – not the issue here.

[5]    The debtors' exhibits are cited "P. Ex. ___." The defendants' joint exhibits are cited as "Def. J. Ex. ___." The supplemental exhibits of the plaintiffs in the MeehanCombs action are cited as "MC Ex. ___." The transcript is cited by volume and page number: "Tr. v. ___ at ___."

is not a debtor here.

Caesars owns, operates, or manages fifty casinos in five countries, including the United States. (MC Ex. 19 at 2). All told, Caesars has 68,000 employees and oversees 3 million square feet of gaming space as well as 39,000 hotel rooms. (*Id.* at 2-3). The debtors own, operate, or manage thirty-eight of the casinos. (*Id.* at 3-4). In its most recent fiscal year, Caesars had revenues in excess of $8 billion, of which the debtors contributed more than $5 billion. (*Id.*).

### b. The Senior Unsecured Notes

In September 2005, CEOC and CEC entered into an indenture with U.S. Bank N.A. as indenture trustee (the "2005 indenture"). (MC Ex. 19 at 27; Def. J. Ex. 88 at 9; MC Ex. 1 at 11; P. Ex. 40). Pursuant to the 2005 indenture, CEOC issued $750 million in notes due 2017 with an interest rate of 5.75 percent. (MC Ex. 19 at 21; Def. J. Ex. 88 at 9; MC Ex. 1 at 11). In June 2006, CEOC and CEC entered into a second indenture with U.S. Bank as indenture trustee (the "2006 indenture"). (MC Ex. 19 at 27; Def. J. Ex. 88 at 2; MC Ex. 1 at 11; P. Ex. 41). Pursuant to the 2006 indenture, CEOC issued another $750 million in notes, these due 2016 with a 6.50 percent interest rate. (MC Ex. 19 at 21; Def. J. Ex. 88 at 9; MC Ex. 1 at 11).

CEOC's obligations under the 2016 and 2017 notes were unsecured (MC Ex. 19 at 27), but CEC guaranteed CEOC's obligations under the indentures and the notes (Def. J. Ex. 88 at 9; MC Ex. 1 at 11; P. Ex. 40 at Art. XII; P. Ex. 41 at Art. XV). MeehanCombs holds $15,318,000 of the 2016 notes and $5,632,000 of the 2017 notes. (MC Ex. 1 at 11). Danner holds $104 million of the 2016 notes. (Def. J. Ex. 88 at 2; P. Ex. 80A; Tr. v. II at 163-64, 244-45).[6]

---

[6]     At the hearing, the amount of Danner's 2016 notes was said to total $119 million. (*See* P. Ex. 80A). That figure, it was eventually explained, includes the $15 million in 2016 notes that MeehanCombs holds. (Tr. v. II at 244-45).

### c. The 2008 Leveraged Buyout

In 2008, affiliates of Apollo Global Management, LLC ("Apollo") and TPG Capital LP

("TPG"), along with other investors, acquired CEC (and thus its subsidiaries) in a $30.7 billion

leveraged buyout. (MC Ex. 19 at 4, 16). Apollo, TPG, and the investors paid $6.1 billion of that

amount in cash; the remainder was funded through the issuance (presumably by CEOC) of

roughly $24 billion in debt. (*Id.*; *see generally* Tr. v. II at 153-56 (describing the debtors' capital

structure)). Of the $24 billion, $19.7 billion was secured by liens on substantially all of the

debtors' assets. (MC Ex. 19 at 4).

### d. The Second Lien Notes

In 2009, CEC and CEOC entered into an indenture with U.S. Bank as indenture trustee

(the "2009 indenture"). (MC Ex. 19 at 25; Def. J. Ex. 44 at 2, 18; P. Ex. 45). Pursuant to the

indenture, CEOC issued $3.71 billion in notes due 2018 with an interest rate of 10 percent. (Def.

J. Ex. 44 at 18). CEOC's obligations under the notes were secured by second priority liens on,

among other things, substantially all of CEOC's assets. (MC Ex. 19 at 25; Def. J. Ex. 44 at 18).

In addition, CEC guaranteed CEOC's obligations under the indenture and the notes. (Def. J. Ex.

44 at 18; P. Ex. 45 at Art. XII).

In 2010, CEC and CEOC entered into still another indenture with U.S. Bank as indenture

trustee (the "2010 indenture"). (MC Ex. 19 at 24-25; Def. J. Ex. 41 at 19; Def. J. Ex. 44 at 18; P.

Ex. 52). Pursuant to the indenture, CEOC issued $750 million in notes due 2018, these with an

interest rate of 12.75 percent. (Def. J. Ex. 41 at 19; Def. J. Ex. 44 at 18). CEOC's obligations

under the notes were secured in part by second priority liens on substantially all of CEOC's

assets. (MC Ex. 19 at 25; Def. J. Ex. 41 at 19; Def. J. Ex. 44 at 18-19). As with the other second

lien notes, CEC guaranteed all of CEOC's obligations under the 2010 indenture and the notes.
(Def. J. Ex. 41 at 20; Def. J. Ex. 44 at 19; P. Ex. 52 at Art. XII).

Wilmington succeeded U.S. Bank as indenture trustee under the 2009 indenture. (Def. J.
Ex. 44 at 2). BOKF succeeded U.S. Bank as the indenture trustee under the 2010 indenture.
(Def. J. Ex. 41 at 8).[2]

### e. The Economy

Unfortunately for Caesars' new owners, they acquired the gaming enterprise at the
beginning of the 2008 financial crisis and resulting recession. (MC Ex. 19 at 5, 28). For several
years thereafter, casinos worldwide struggled as spending on travel and entertainment declined.
(*Id.*). But even after the economy began to recover, CEOC's total revenues continued to decline,
a result of increased competition in the gaming industry and the industry's reduced share of
overall consumer spending on travel and entertainment. (*Id.* at 5, 28-31). With declining
revenues, CEOC found itself unable to generate cash flow sufficient to service the "substantial
debt load" remaining from the 2008 buyout. (*Id.* at 5; Tr. v. I at 61).

### f. The "Disputed Transactions"

Beginning in 2009 or so, Caesars sought to "restructure and manage" CEOC's debt. (MC
Ex. 19 at 31). Caesars engaged in more than forty-five "capital market transactions," including
"asset sales, exchange and tender offers, debt repurchases and re-financings." (*Id.* at 6).

---

[2]    These are by no means the only notes that CEOC has issued and CEC has
guaranteed. As of December 31, 2014, CEOC had outstanding $6.345 billion in first lien notes,
$5.238 billion in second lien notes, and $530 million in senior unsecured notes. (MC Ex. 19 at
21). CEC's total potential liability on guaranty claims related to these notes is approximately $12
billion. (Tr. v. I at 46, 97).

According to the debtors, these transactions were designed to "extend debt maturities, meet interest obligations, monetize assets[,] and transfer debt and capital expenditure obligations at properties CEOC could not afford to invest in." (*Id.*).

Before the transactions, however, CEC was a holding company that owned 100 percent of CEOC; CEC had no other assets. (Tr. v. I at 70) ("At the time the guarantees [of the second lien and senior unsecured notes] were given [CEC] was a holding company. It had nothing in it other than the equity in CEOC."). Only as a result of the assets that CEC obtained through the various transactions did it come to have "independent value," meaning value beyond its ownership interest in CEOC. (*Id.* at 70-71; *see also id.* at 129). As of January 2015, CEC had a market capitalization of $1.8 billion (MC Ex. 19 at 16) and an enterprise value of roughly $3 billion (Tr. v. I at 50-51, 98).

As a consequence, many of CEOC's creditors take a different view of many if not all of the transactions (collectively, the "disputed transactions"). They consider them part of a carefully orchestrated plan to "strip CEOC of valuable assets," moving those assets "beyond the reach of CEOC's creditors." (Def. J. Ex. 44 at 3, 5; *see also* Def. J. Ex. 41 at 60; Def. J. Ex. 42 at 13-15; Def. J. Ex. 43 at 33-34). The plan's goal as well as its effect, these creditors suggest, was to create a "Good Caesars" (CEC and its affiliates, holding prime assets that once belonged to CEOC) and a "Bad Caesars" (CEOC, left with barely profitable or unprofitable properties and burdened with debt remaining from the 2008 leveraged buyout). (Def. J. Ex. 41 at 22-24; Def, J. Ex. 44 at 7; *see also* Def. J. Ex. 42 at 15 (describing the disputed transactions as designed to create a "Solvent Caesars" and an "Insolvent Caesars")).

Two of these transactions gave rise to the actions the debtors want enjoined.

### i. The "B-7 Refinancing"

The first was a transaction the debtors and others call the "B-7 Refinancing." In May

2014, CEC and CEOC had CEOC amend its first lien credit agreement and obtain an additional

$1.75 billion in new term loans. (MC Ex. 19 at 35; Def. J. Ex. 41 at 35). The first lien credit

agreement was amended in ways beneficial to CEC (MC Ex. 19 at 36), and the loan proceeds

were used to retire certain outstanding debt (MC Ex. 19 at 36; Def. J. Ex. 41 at 35).

More important, as part of the same transaction CEC sold 68.1 shares, or five percent, of

CEOC common stock for $6.15 million to institutional investors not affiliated with CEC. (MC

Ex. 19 at 35; Def. J. Ex. 41 at 35). CEC then took the position that the stock sale had released its

guaranty of CEOC's obligations under its first and second lien notes (MC Ex. 19 at 36; Def. J.

Ex. 41 at 36), announcing that position publicly in a Form 8-K filed with the SEC on May 6,

2014 (Def. J. Ex. 41 at 36). CEC took that position, apparently, because it believed the relevant

indentures terminated the guaranty if CEOC ceased to be a wholly-owned subsidiary of CEC.

(*See* Def. J. Ex. 41 at 4). CEOC takes the same position here. (*See* MC Ex. 19 at 7).[8]

### ii. The "Senior Unsecured Notes Transaction"

The second transaction was one the debtors and others call the "Senior Unsecured Notes

Transaction." On August 12, 2014, CEC and CEOC consummated a transaction with certain

holders of CEOC's outstanding senior unsecured notes. (MC Ex. 19 at 36). The noteholders

involved in the transaction held more than 51 percent of the senior unsecured notes. (*Id.*). In the

transaction, CEC and CEOC repurchased $155.4 million of the notes, with CEC and CEOC each

---

[8]    Less than a month later, in June 2014, CEC allegedly disposed of more CEOC
common stock, transferring 6 percent of its CEOC stock to an employee benefits plan. (Def. J.
Ex. 41 at 42-43).

paying the noteholders $77.7 million as well as accrued and unpaid interest. (*Id.* at 36-37; Def. J. Ex. 42 at 2; Def. J. Ex. 43 at 3, 22).

As part of the transaction, the indentures were amended so that the selling noteholders agreed to support any future restructuring that had the consent of at least 10 percent of holders of senior unsecured notes still outstanding. (MC Ex. 19 at 37; Def. J. Ex. 42 at 3). The participating noteholders also entered into supplemental indentures that modified the provisions restricting disposition of "substantially all" of CEOC's assets and – most important – removed CEC's guaranty of the senior unsecured notes. (MC Ex. 19 at 37; Def. J. Ex. 42 at 3; Def. J. Ex. 43 at 23).

### g. The Delaware and New York Actions

The two transactions, and especially the purported release of CEC's guarantees, did not sit well with the second lien noteholders or with the senior unsecured noteholders (at least those who had not participated in the Senior Unsecured Notes Transaction). A flurry of litigation ensued.

On August 4, 2014, Wilmington filed an action in the Delaware Court of Chancery against CEC, CEOC, and other defendants, including other CEC affiliates, directors and officers of CEC, and directors of CEOC. (MC Ex. 19 at 40; *see* Def. J. Ex. 44). Of the nine counts in Wilmington's complaint, two are relevant here. Count II is a claim for damages against CEC alleging that the B-7 Refinancing breached the 2009 indenture in various ways and also breached CEC's implied duty of good faith and fair dealing. (Def. J. Ex. 44 at 62-64). Count III is a claim against CEC seeking a declaratory judgment that CEC's guaranty of the notes subject to the 2009 indenture has not been released but remains enforceable. (*Id.* at 65-68).

A month later, on September 3, 2014, MeehanCombs brought an action against CEC and

CEOC in the U.S. District Court for the Southern District of New York. (MC Ex. 19 at 41; *see*

Def. J. Ex. 43). The MeehanCombs complaint has eight counts, all directed at both CEC and

CEOC, and all alleging claims based on the Senior Unsecured Notes Transaction. (Def. J. Ex.

43). Counts I and II request declaratory judgments that the guarantees in the 2005 and 2006

indentures are still in effect and the supplemental indentures are void. (*Id.* at 24-29). Count III is

a claim for damages under the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb (the

"TIA"). (*Id.* at 29-32). Counts IV through VII are claims for damages alleging that CEOC and

CEC breached the indentures and guarantees. (*Id.* at 32-37). Count VIII is a damages claim for

breach of the duty of good faith and fair dealing. (*Id.* at 37-41).[9]

On October 2, 2014, Danner filed a class action against CEC and CEOC in the same

district. (MC Ex. 19 at 41; *see* Def. J. Ex. 42). The Danner complaint has five counts. As with

the MeehanCombs complaint, all of the counts are directed at both CEC and CEOC, and all

contest the Senior Unsecured Notes Transaction. (Def. J. Ex. 42). Count I requests a declaratory

judgment that the original 2006 indenture is in effect and the supplemental indenture is void. (*Id.*

at 18-20). Count II is a claim for damages under the TIA. (*Id.* at 20-21). Counts III and IV are

damage claims alleging breaches of the 2006 indenture. (*Id.* at 21-23). Count V is a damages

claim for breach of the duty of good faith and fair dealing. (*Id.* at 23-26).[10]

---

[9]     In January 2015, MeehanCombs filed an amended complaint. (MC Ex. 1). The
claims remained the same; the complaint was amended only to make clear that in light of these
bankruptcy cases, MeehanCombs was not seeking to pursue the action against CEOC. (*Id.* at 2).

[10]     Like the MeehanCombs complaint, the Danner complaint was later amended to
make clear that because of these bankruptcy cases, the Danner claims were no longer being
asserted against CEOC. (Def. J. Ex. 88 at 1-2).

In March 2015, six months after the Danner action was filed, BOKF filed an action

against CEC alone in the Southern District of New York. (Def. J. Ex. 41). The complaint has

seven counts. As with the Wilmington complaint, all the counts in the BOKF complaint concern

the B-7 Refinancing. Counts I, III, and IV are claims for damages alleging that CEC breached

the guaranty and the 2010 indenture. (*Id.* at 52-53, 57-59). Count II requests a declaratory

judgment that the guaranty was not released and is still in effect. (*Id.* at 53-57). Counts V, VI,

and VII are damage claims asserting, respectively, TIA violations, intentional interference with

contractual relations, and breach of the duty of good faith and fair dealing. (*Id.* at 60-65).

In May 2015, the district court hearing the BOKF action (as well as the MeehanCombs

and Danner actions) was notified that BOKF planned to move for partial summary judgment on

Counts II and V of its complaint even though BOKF had taken no discovery and discovery would

not close for some months. (*See* Def. J. Ex. 136). CEC asked the district court to defer

consideration of the motion, *see* Fed. R. Civ. P. 56(b) (allowing a party to move for summary

judgment at any time unless "the court orders otherwise"), but the court declined to do so and set

a briefing schedule on the motion (Def. J. Ex. 136; *see also* Tr. v. 1 at 139-40). BOKF filed its

motion on June 25, 2015. (*See BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-cv-1561

(SAS), Dkt. No. 30).[11]

### h. Insurance

CEC and CEOC notified their insurers about each of the four actions. (Tr. v. II at 179-

80). CEC is the named insured under a $15 million management liability policy with National

---

[11]     The court can take judicial notice of the records of other courts in related matters.
*Bank of Commerce & Trust Co. v. Strauss (In re Strauss)*, 523 B.R. 614, 623 n.7 (Bankr. N.D. Ill.
2014).

Union Fire Insurance Company of Pittsburgh. (*See* P. Ex. 65). Other insureds under the policy

are CEC's subsidiaries (including CEOC), CEC's officers and directors, and officers and

directors of CEC's subsidiaries. (Tr. v. II at 171).

The policy provides four forms of coverage, three of which are relevant. The policy pays

the losses of directors and officers who have no indemnification from CEC or any subsidiary. (P.

Ex. 65 at 2957). It pays the losses of CEC and any subsidiary for payments made on behalf of

indemnified officers and directors. (*Id.*) And it pays the losses of CEC and the subsidiaries

themselves – but only losses arising from a "securities claim," a defined term. (*Id.*). This third

coverage the policy calls "organization coverage." (*Id.*).

Claims under the policy are paid in a specified order. All covered losses of directors and

officers without indemnification are paid first, then losses of directors and officers who have

been indemnified. (*Id.* at 3013; Tr. v. II at 266). Only after payment of those losses are losses of

CEC, CEOC, and the other subsidiaries as covered "organizations" paid. (*Id.*). Coverage also

includes payment of defense costs. (P. Ex. 65 at 2977; Tr. v. II at 178-79).

The National Union policy, which has a self-insured retention of $1.25 million, is the first

layer of $280 million in management liability insurance coverage from an assortment of insurers.

(Tr. v. II at 174-75, 179, 221; MC Ex. 16). Coverage under each of the policies is similar. (Tr.

v. II at 179). Only the initial $155 million of coverage, however, is available to CEC and its

subsidiaries for their liabilities; the $125 million excess of the initial $155 million is coverage for

officers and directors. (Tr. v. II at 174-75; MC Ex. 16).

In October 2014, National Union sent CEC a letter acknowledging that the

MeehanCombs action involves a securities claim as defined in the policy but reserving rights on

whether the Wilmington action is a securities claim. (P. Ex. 71 at 6). National Union noted in

-14-

the letter that "breach of contract and declaratory judgment claims are generally held to be

uninsurable." (*Id.* at 7).   Later the same month, National Union sent CEC a second letter

acknowledging that the Danner action involves a securities claim.  (P. Ex. 72 at 1).  The second

letter referred to the first National Union letter and deemed it applicable to the Danner action.

(*Id.* at 2).  National Union has not taken a position on the BOKF action.  (Tr. v. II at 186).  The

excess carriers have taken positions on coverage consistent with National Union's position.  (*Id.*).

   The retention under the National Union policy has been met.  (*Id.* at 181).  No claims

have yet been paid.  (*Id.*).  National Union has consented to the retention of defense counsel in

the Wilmington, MeehanCombs, and Danner actions (*see* P. Exs. 71 at 8, 72 at 2) and

presumably has paid and will continue to pay defense costs.

### i. The Special Governance Committee

   In June 2014, shortly before the Wilmington action was filed, CEOC appointed to its

board two independent directors and formed a Special Governance Committee of the board

consisting of the two independent directors (the "SGC").  (MC Ex. 19 at 38).  The SGC was

given the task of investigating the disputed transactions and determining whether the debtors or

their creditors (or both) have claims against CEC or its affiliates.  (*Id.* at 38-39; *see also* Tr. v. I

at 83).

   In August 2014, the SGC began an investigation that has taken thousands of hours and

required the analysis of tens of thousands of documents.  (MC Ex. 19 at 39).  Although the

investigation is continuing and the SGC's specific conclusions have yet to be disclosed in these

bankruptcy cases, the SGC apparently found that CEOC has "substantial claims" against CEC

and its affiliates arising out of the disputed transactions, including claims for avoidable

preferences and fraudulent transfers. (*Id.*; Tr. v. I at 50; Tr. v. II at 151; *see also* Tr. v. I at 35-36,

44-45 (calling the claims "an important estate asset"), 71, 82).

### j. The Restructuring Support Agreement

Around the same time the SGC was starting its investigation, the debtors began

negotiating with CEOC's first lien creditors and with CEC over the terms of a possible

restructuring. (MC Ex. 19 at 42; Tr. v. II at 18). On December 19, 2014, the debtors, CEC, and

some of CEOC's first lien noteholders reached an agreement on the terms of a restructuring that

they documented in a Restructuring Support and Forbearance Agreement and accompanying term

sheet (the "RSA"). (*Id.* at 43; Tr. v. I at 127).

The terms of the RSA are complex (*see generally* P. Ex. 20), but only two aspects are

relevant here. First, CEC agreed to make a financial contribution to the debtors' restructuring.

(P. Ex. 20, Ex. B at 11-13). The contribution takes several different forms that need not be

described. (*Id.*; *see also* MC Ex. 19 at 43-44; Tr. v. II at 279-80 (noting that the contribution is

"comprised of five different elements")). The parties disagree about the contribution's monetary

value. The debtors call the total contribution "substantial" (MC Ex. 19 at 11; Tr. v. I at 127) and

"significant" (MC Ex. 19 at 43; Tr. v. I at 35-36, 81), valuing it in excess of $2.5 billion (Tr. v. I

at 196). The defendants are skeptical. (*See generally* Tr. v. II at 14-52). The exact value is

unimportant.

Second, in exchange for CEC's contribution under the RSA, CEOC agreed that its plan of

reorganization would provide for the release of all claims the estates had against CEC, its

affiliates (including Apollo and TPG), shareholders, officers, directors, and others. (P. Ex. 20,

Ex. B at 12; *see also* Tr. v. I at 89-93; Tr. v. II at 56-57, 220). Among other things, then, the

RSA would release CEC from more than $12 billion in noteholder guaranty claims (Tr. v. I at 97) as well as from all claims the estates might have against CEC (*see id.* at 150; *see also* P. Ex. 20, Ex. B at 12-13) in exchange for a CEC contribution of perhaps $2.5 billion.

The debtors find that sort of comparison unhelpful. They note that the RSA represents a settlement of contested claims. (Tr. v. I at 36, 47, 58, 133). They also do not consider the RSA to be fixed, let alone the plan that will ultimately be proposed for confirmation. (*Id.* at 39-40). Rather, they say, the RSA is "a work in process" (*id.* at 65) that should serve as a basis for further negotiation (*id.* at 64; Tr. v. II at 192). According to the debtors, the RSA is simply a "useful device to get creditors to focus on a relative recovery and an absolute recovery . . . ." (Tr. v. I at 64-65).

Many of CEOC's creditors, on the other hand, and particularly the second lien noteholders who do not stand to be paid much under it, view the RSA not as a way to spark negotiations but rather as a "sweetheart deal." (*Id.* at 105). To them, the true beneficiary is CEC, since the RSA effectively leaves CEC in control of the enterprise (Tr. v. II at 20-23, 38-39), "exonerates [CEC] from liability for billions of dollars of transfers, . . . doesn't make it pay very much money, and gives sweeping releases to everybody who got near those transfers" (Tr. v. I at 106).

### k. The Bankruptcy Cases

On January 12, 2015, less than a month after the execution of the RSA, three second lien noteholders filed an involuntary bankruptcy petition against CEOC in the District of Delaware. (*In re Caesars Entm't Operating Co.*, No. 15-10047-KG (Bankr. D. Del.), Dkt. No. 1). Three days later, on January 15, 2015, CEOC and the other debtors filed voluntary chapter 11 petitions

in this district. (Bankr. Dkt. No. 1). After initially staying the voluntary cases (*In re Caesars Entm't Operating Co.*, No. 15-10047-KG (Bankr. D. Del.), Dkt. No. 47), the Delaware bankruptcy court determined under Rule 1014(b), Fed. R. Bankr. P. 1014(b), that all of the cases should proceed in this district (*id.* No. 220). The court lifted the stay and transferred the involuntary case here. (*Id.*). That case is pending and is set for trial in October 2015.

### I. The Adversary Proceeding

On March 11, 2015, just over a week after BOKF filed its action against CEC, the debtors filed an adversary complaint in the bankruptcy cases, naming as defendants BOKF, Wilmington, MeehanCombs, and Danner. (Adv. Dkt. No. 1).

The complaint alleges that the four actions concern "the very same assets transfers and capital markets transactions that will be litigated in the bankruptcy cases" and asserts that the continuation of the actions "threatens to harm the Debtors' estate[s] and imperil their ability to reorganize." (*Id.* at 2). The reorganization would be imperiled, the debtors allege, because CEC would be unable to make the financial contribution on which the reorganization depends if the guarantees were reinstated. (*Id.* at 10-11). The estates would be harmed because the actions could deplete the insurance that CEOC shares with CEC, insurance that the debtors say is property of the bankruptcy estates. (*Id.* at 11). The complaint has two counts. Count I seeks a declaratory judgment "extending the automatic stay" under section 362(a) of the Code to "non-debtor affiliates" of CEOC. (*Id.* at 12-13). Count II requests an injunction under section 105(a) temporarily halting the continuation of the actions against the "non-debtor affiliates." (*Id.* at 13-15).

Along with the complaint, the debtors filed a motion for an order "staying or enjoining

the continued prosecution of the actions." (*Id.* No. 4 at 15). The motion is not keyed to either count of the complaint, but because the request is for injunctive relief and only Count II seeks that relief, the motion has been interpreted as a motion for a preliminary injunction on Count II. In the course of the litigation, other matters fell away,[12] leaving a single question: whether prosecution of the defendants' guaranty claims against CEC should be enjoined under section 105(a).

### 3. Discussion

The answer is no. In the Seventh Circuit, the section 105(a) injunction is a more limited remedy than in other circuits. A bankruptcy court can issue an injunction halting third-party litigation against a non-debtor in another court only when (among other things) the third party's claims against the non-debtor arise out of the same acts as claims the bankruptcy estate has against the non-debtor. The debtors have not demonstrated that the claims the estates have against CEC arise out of the same acts as the guaranty claims the defendants are pursuing against CEC in Delaware and New York. As for CEOC's insurance, the policy may be property of the estate, but the proceeds are not. CEC has an independent right under the policy to payment of its

---

[12]      The complaint had sought relief not only because the actions allegedly threatened CEC's contribution to the restructuring and CEOC's insurance coverage but also because (1) some of the claims asserted in the actions were derivative claims and so were property of the bankruptcy estates; (2) successful prosecution of the claims against CEOC's directors would give rise to claims for indemnification against CEOC; and (3) burdensome discovery in the actions would distract critical CEOC employees from their restructuring obligations. (Adv. Dkt. No. 1 at 10-11). But the derivative claims, including the claims against the CEOC directors, were claims only in the Wilmington action, and Wilmington agreed those claims were stayed under section 362(a). (*See id.* Nos. 22 at 10, 129 at 4 n.3). That left as the only claims to be enjoined the contract, TIA, good faith and fair dealing, and declaratory judgment claims against CEC, along with Danner's claim against CEC for intentional interference with contractual relations (collectively, "the guaranty claims"). (*Id.* No. 129 at 4 n.3). As to those claims, the debtors elected to abandon their "distraction" theory. (*Id.* No. 114 at 2).

losses, regardless of whether any other insured is a debtor in a bankruptcy case.

### a. The Section 105(a) Injunction

Section 105(a) of the Code provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Considered the bankruptcy version of the All Writs Act, *see In re 1900 M Rest. Assocs., Inc.*, 352 B.R. 1, 7 (D.D.C. 2006) (quoting legislative history); *In re Chateaugay Corp.*, 109 B.R. 613, 621 (S.D.N.Y. 1990); *Regency Realty Assocs. v. Howard Fertilizer, Inc. (In re Regency Realty Assocs.)*, 179 B.R. 717, 719 (Bankr. M.D. Fla. 1995), the statute authorizes a bankruptcy court to take actions necessary to implement other Code provisions, *In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004), and to protect the court's jurisdiction, *Levey v. Sys. Div., Inc. (In re Teknek, LLC)*, 563 F.3d 639, 648 (7th Cir. 2009); *Fisher*, 155 F.3d at 882; *Chateaugay*, 109 B.R. at 621; 2 *Collier on Bankruptcy* ¶ 105.01 at 105-6 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015).

Among other powers, section 105(a) permits a bankruptcy court to protect its jurisdiction by enjoining, at least temporarily, the prosecution of a third party's action against a non-debtor in another court. That power has long been recognized not only in the Seventh Circuit, *see, e.g., Teknek*, 563 F.3d at 648; *Fisher*, 155 F.3d at 882; *L & S*, 989 F.2d at 932; *Energy Coop.*, 886 F.2d at 929, but elsewhere, *see, e.g., Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1242 (6th Cir. 1993); *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 599 (10th Cir. 1990) (calling the remedy "hornbook law"), and is mentioned in the statute's legislative history, *see* S. Rep. No. 95-989, at 51 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5836-37; H. Rep. No. 95-595, at 342 (1978),

*reprinted in* 1978 U.S.C.C.A.N. 5963, 6298.

To obtain an injunction under section 105(a), it is unnecessary to satisfy the traditional elements for injunctive relief. *Fisher*, 155 F.3d at 882. As long as the third-party litigation would "'defeat or impair'" the bankruptcy court's "'jurisdiction over the case before it,'" *id.* (quoting *L & S*, 989 F.2d at 932), the debtor need show only (1) that there is a "'likelihood of success on the merits,'" *id.* (quoting *L & S*, 989 F.2d at 932), which in this context means the likelihood of a successful reorganization, *In re Excel Innovations*, 502 F.3d 1086, 1095 (9th Cir. 2007); *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009); and (2) that the injunction would serve in the public interest, *Fisher*, 155 F.3d at 882. The debtor need not show irreparable harm or an inadequate remedy at law. *Id.*[13]

But before these elements can be considered, the case must be one in which relief under section 105(a) is possible. *Phar-Mor, Inc. v. General Elec Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*, 166 B.R. 57, 61 (W.D. Pa. 1994). In its two most recent decisions on the subject, *Fisher* and *Teknek*, the Seventh Circuit restricted the section 105(a) remedy to a particular set of "limited circumstances." *Fisher*, 155 F.3d at 882. Perhaps because the purpose of a section

---

[13]      It is unclear whether the debtor must show that the equities weigh in his favor. Typically, a plaintiff seeking a preliminary injunction must make that showing, *see, e.g., Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481 (7th Cir. 2015), *petition for cert. filed*, 83 U.S.L.W. 3747 (U.S. Mar. 18, 2015) (No. 14-1136), and some bankruptcy court decisions in this district mention balancing the equities as a necessary exercise before relief can be granted, *see, e.g., Gander Partners LLC v. Harris Bank, N.A. (In re Gander Partners LLC)*, 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010), *aff'd*, 442 B.R. 883 (N.D. Ill. 2011). But neither of the Seventh Circuit decisions setting out the elements of a section 105(a) injunction mentions balancing the equities as one of them. *See Fisher*, 155 F.3d at 882; *L & S*, 989 F.2d at 932. *Fisher* affirmed the entry of a section 105(a) injunction without considering (expressly, at least) how the equities balanced, *see Fisher*, 155 F.3d at 882-83, although the bankruptcy court had done so, *see id.* at 879.

105(a) injunction is to protect the bankruptcy court's jurisdiction, the Seventh Circuit defined

those circumstances in jurisdictional terms, permitting the bankruptcy court to enjoin third-party

litigation against a non-debtor only if that litigation "is sufficiently 'related to'" the case before

court. *Fisher*, 155 F.3d at 882 (quoting 28 U.S.C. § 1334(b)); *see also Teknek*, 563 F.3d at 648.

To understand when third-party claims against a non-debtor are sufficiently related to a

bankruptcy case that their prosecution can barred, it is useful to consider the claims in *Fisher* and

*Teknek*. *Fisher* was a chapter 7 case arising out of a Ponzi-like scheme run by Thomas Collins,

his corporation, and several accomplices. *Fisher*, 155 F.3d at 877-78. The corporation ended up

in bankruptcy, and the investors sued the accomplices in the district court, alleging a variety of

fraud claims. *Id.* The trustee in the bankruptcy case filed an adversary proceeding asserting

(among other things) that the estate had fraud claims of its own against the accomplices and

asking to enjoin prosecution of the investors' claims. *Id.* at 878-79. The bankruptcy court

granted the injunction, reasoning that the trustee had standing to pursue the investors' claims. *Id.*

at 879. The district court reversed, finding those claims were not property of the estate. *Id.*

On appeal, the court of appeals agreed that the investors' claims were not estate property,

*id.* at 881, but found the injunction proper nonetheless under section 105(a). Although the

investors' claims were not property of the estate, the court said, it was "difficult to imagine" how

they could be "more closely 'related to' it": "They are claims to the same limited pool of money,

in the possession of the same defendants, as a result of the same acts, performed by the same

individuals, as part of the same conspiracy." *Id.* Of these factors, the most important was that

the claims arose out of the "same acts." The critical question, the court emphasized, is "the

overlap between the claims of the debtor . . . and the claims of the creditors . . . against third

parties." *Id.* at 883. The claims must be "so closely related" that allowing the third-party claims

in another court to proceed would result in "a race to the courthouse" and "would derail the bankruptcy proceedings." *Id.*

More than ten years later in *Teknek*, the court revisited the section 105(a) injunction question and underscored that to be enjoined, the third party's claims must arise out of the same acts as the estate's claims. Another chapter 7 case, *Teknek* stemmed from a patent judgment that Systems Division, Inc. ("SDI") obtained against Teknek LLC ("Teknek") and a related corporation, Teknek Electronics ("Electronics"). *Teknek*, 563 F.3d at 642. While the patent action was pending, the shareholders of Teknek and Electronics looted the two corporations, transferring their assets to a third, Teknek Holdings ("Holdings"). *Id.* The district court hearing the patent action later added the shareholders and Holdings as defendants in the action on an alter ego theory, making them liable for the judgment. *Id.*

When Teknek (but not Electronics) filed a bankruptcy case, the trustee brought an adversary proceeding against the shareholders seeking to hold them personally liable for Teknek's obligations under the judgment. *Id.* at 642-43. The bankruptcy court issued an injunction preventing SDI from collecting its judgment against the shareholders and Holdings so that the trustee could pursue the judgment on behalf of the estate. *Id.* at 642. The district court reversed, concluding that the claims SDI wanted to pursue in enforcing its judgment were neither property of the estate nor related to the bankruptcy case. *Id.*

The court of appeals agreed and affirmed. The court acknowledged that under *Fisher*, a section 105(a) injunction is available to "block claims that are not property of the estate . . . if they are sufficiently 'related to' claims on behalf of the estate." *Id.* at 648. The court also acknowledged that, as in *Fisher*, the trustee's claims and SDI's claims were claims to "the same pool of money" in possession of "the same defendants." *Id.* at 649. But that, the court said, was

-23-

not enough. Unlike the claims in *Fisher*, the claims at issue in *Teknek* were "not based on the

same acts." *Id.* The looting of Teknek and the looting of Electronics were "separate acts"

causing separate injuries to separate companies, "only one of which is in bankruptcy." *Id.*; *see*

*also id.* at 650 (noting that if not for "the presence of Electronics, an independent non-debtor that

is directly liable to SDI for the patent judgment," an injunction would have been proper).

Under *Fisher* and *Teknek*, then, a bankruptcy court can employ section 105(a) to enjoin

third-party claims against a non-debtor in another court in favor of the bankruptcy estate's claims

only if the third party's claims are sufficiently related to the bankruptcy case. That will be true

only if both sets of claims are claims to the same assets in possession of the same defendants, and

both sets of claims arise out of the same acts. *Id.* at 649; *Fisher*, 155 F.3d at 883; *see also*

*Pinewood Enters., L.C. v. Williams (In re Living Hope Sw. Med. Servs. LLC)*, No. 4:11-CV-

04059, 2012 WL 79661, at *4 (W.D. Ark. Jan. 11, 2012) (citing *Teknek* and issuing stay pending

appeal of section 105(a) injunction in part because the trustee's claims and the enjoined claims

"do not appear to be based wholly on the same acts").

### b. The Debtors' Arguments for Injunctive Relief

The debtors make two arguments for an injunction stopping the Delaware and New York

actions against CEC. One is based on the potential effect of adverse judgments in the actions on

CEC's proposed financial contribution to the debtors' restructuring. The other is based on the

potential effect of those judgments on the debtors' insurance coverage under the National Union

policy. In neither case, however, have the debtors shown what they must: that the bankruptcy

estates have claims arising out of the same acts as the claims in the actions the debtors want

enjoined.[14]

## i. The CEC Contribution Argument

The debtors' first argument goes like this.  The estates in these bankruptcy cases have

claims against CEC arising out of the disputed transactions, transactions that transferred to CEC

most (if not all) of the assets it now owns.  Those claims are one of the estates' principal assets,

and in settlement of them CEC has agreed to make a large financial contribution to the debtors'

reorganization.  If the Delaware and New York actions against CEC are allowed to proceed and

are successful, the defendants will take for themselves the assets that would otherwise fund the

debtors' reorganization.  CEC's contribution will disappear.

The circumstances the debtors describe do not warrant relief under *Fisher* and *Teknek*.

The debtors note that the estates and the defendants have claims against the same entity (CEC),

claims that if successful would be paid from the same pool of assets (CEC's assets).  What the

debtors have not shown is that the estate claims arise out of the "same acts" as the claims in the

---

[14]      MeehanCombs and Danner assert in their post-trial brief that the court
consequently "lacks jurisdiction" to enjoin the actions.  (Adv. Dkt. No. 153 at 14).  The assertion
is understandable, given that *Fisher* and *Teknek* both employ jurisdictional language to describe
when a section 105(a) injunction is proper, even citing section 1334(b).  In neither decision,
however, did the court say that the bankruptcy court did (*Fisher*) or did not (*Teknek*) have
jurisdiction to issue an injunction, and the better interpretation is that those decisions concern,
not subject matter jurisdiction, but the scope of the section 105(a) remedy.  *See American
Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods)*, 885 F.2d 621, 624 (9th
Cir. 1989) (distinguishing between the bankruptcy court's jurisdiction to entertain an action
seeking a section 105(a) injunction and its power to issue the injunction itself); *Lyondell*, 402
B.R. at 586 (same); 3 *Collier on Bankruptcy, supra*, ¶ 362.04 at 362-49 to -50 (noting that
issuance of a section 105 injunction "appears to be . . . directed to the discretion of the court
rather than to its jurisdiction").  That a claim fails on the merits does not mean the court lacked
jurisdiction to hear the claim in the first place. *Bell v. Hood*, 327 U.S. 678, 682 (1946); *Bovee v.
Broom*, 732 F.3d 743, 744 (7th Cir. 2013); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 316
F.3d 731, 733 (7th Cir. 2003).

Delaware and New York actions. The claims in those actions are based on either the B-7

Refinancing or the Senior Unsecured Notes Transaction. Not only have the debtors failed to

show the estates have the same claims arising out of those transactions (and it is hard to see how

the estates could), the debtors have failed to show the estates have *any* claims against CEC

arising out of them.[15] Without competing estate claims based on the same acts – the breach of

the indentures and notes and the release of CEC's guarantees – the debtors have no case for a

section 105(a) injunction. *Teknek*, 563 F.3d at 649; *Fisher*, 155 F.3d at 883.

     Rather than address the B-7 Refinancing and Senior Unsecured Notes Transaction, the

debtors focus on the disputed transactions as a whole. The debtors suggest that the estates'

claims and the defendants' claims all arise out of the same overarching scheme to strip CEOC of

its assets. (Adv. Dkt. Nos. 129 at 5, 151 at 9).

     The debtors' suggestion misses the mark. They are right, of course, that the Delaware

and New York complaints allege a broader scheme on CEC's part to transfer away CEOC assets.

But those allegations are not essential (to take a single example) to the defendants' breach of

contract claims. A plaintiff with a claim for breach of contract typically must plead and prove

only "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance

by the plaintiff of all required conditions, (5) breach, and (6) damages." *Wigod v. Wells Fargo*

*Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (describing the standard elements at common law

---

    [15]    The only evidence on the subject came from CEOC's chief restructuring officer,
Randall Eisenberg, who testified under questioning from the court that CEOC has claims arising
from the B-7 Refinancing and Senior Unsecured Notes Transaction. (Tr. v. II at 152-53). But
Eisenberg did not describe what those claims might be, and he admitted he took that position
only because it was his impression that all of the disputed transactions gave CEOC claims. (*Id.*
at 153). He admitted he did not know the SGC's view on which transactions gave rise to claims.
(*Id.*). James Millstein, financial advisor and investment banker to the debtors, testified that
CEOC has no such claims. (Tr. v. I at 132).

(internal quotation omitted)).  There is no need to plead or prove that the breach was part of some

larger scheme.  The defendants' allegations add flavor to their contract claims, nothing more.[16]

The debtors cannot satisfy the "same acts" requirement of *Fisher* and *Teknek* through the general

air of conspiracy the defendants cultivate.[17]

The debtors contend nonetheless that this is "a textbook case" for a section 105(a)

injunction.  (Adv. Dkt. No. 129 at 1).  They reach that conclusion because the injunction would

stop litigation against a party who had guaranteed a debtor's debts and intended to make a

financial contribution to its reorganization.  The pattern, the debtors insist, is a familiar one.

It is.  Although the facts vary slightly from case to case, courts have often issued section

105(a) injunctions to halt actions of the kind and under the circumstances the debtors describe.

*See, e.g., In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997); *Saxby's Coffee*

*Worldwide, LLC v. Larson (In re Saxby's Coffee Worldwide, LLC)*, 440 B.R. 369, 384 (Bankr.

E.D. Pa. 2009); *Lyondell*, 402 B.R. at 594; *In re Kham & Nate's Shoes No. 2, Inc.*, 97 B.R. 420,

428-29 (Bankr. N.D. Ill. 1989); *Rustic*, 55 B.R. at 31; *Lahman Mfg. Co. v. First Nat'l Bank (In re*

*Lahman Mgf. Co.)*, 33 B.R. 681, 685 (Bankr. D.S.D. 1983); *Otero Mills, Inc. v. Security Bank &*

---

[16]    It is unnecessary to go through this same analysis for the other guaranty claims:
the declaratory judgment claims, TIA claims, claims for breach of the duty of good faith and fair
dealing, and Danner's intentional interference with contract claim.  Unless all of the defendants'
guaranty claims can be enjoined, there is no point in enjoining any of them.  (The declaratory
judgment and good faith and fair dealings claims appear simply to be variations on the breach of
contract theme in any event.)

[17]    At the close of the hearing, the court asked the parties in their post-trial briefs to
"do the analytical part of taking each of the counts that the [debtors] want enjoined and explain to
me why or why not I have the power under Fisher and Teknek, which are the two operative cases,
to enjoin those counts."  (Tr. v. II at 270).  Rather than provide that count-by-count analysis, the
debtors have chosen to paint with a far broader brush.  It is fair to infer that the debtors have not
explained how the estates' claims and the defendants' claims arise out of the same acts because
they do not.

*Trust (In re Otero Mills, Inc.)*, 21 B.R. 777, 779 (Bankr. D.N.M. 1982).  In some cases, the mere

possibility that the action could impair the non-debtor's financial support of the debtor's

reorganization was enough to warrant relief.  *See Regency*, 179 B.R. at 719 (citing cases and

calling this the "classic scenario").

But the Seventh Circuit has a different textbook.  *Fisher* and *Teknek* narrow the

circumstances under which bankruptcy courts in this circuit can grant section 105(a) injunctions

to shield non-debtors from third-party litigation.  Unless the debtor's estate has a claim against

the non-debtor, and unless that claim is based on the same acts and would be paid from the same

assets as the third party's claim against the non-debtor, no relief is possible.  *Teknek*, 563 F.3d at

649; *Fisher*, 155 F.3d at 883.  *Fisher* and *Teknek* therefore rule out relief in favor of a non-debtor

guarantor based purely on the contention that without it the non-debtor will be unable to devote

time, money, or both to the debtor's reorganization.

The limits *Fisher* and *Teknek* place on the ability of bankruptcy courts to protect their

jurisdiction through a section 105(a) injunction are consistent with the idea that bankruptcy

jurisdiction itself is "limited," *In re FedPak Sys. Inc.*, 80 F.3d 207, 213-14 (7th Cir. 1996),

particularly in this circuit, *id.*; *see also ALT Hotel, LLC v. DiamondRock Allerton Owner, LLC

(In re ALT Hotel, LLC)*, 479 B.R. 781, 806 (Bankr. N.D. Ill. 2012).  They are consistent, as well,

with notions of comity – a recognition that for one court to meddle with proceedings in another

court, especially the court of a different sovereign, is no small matter.  *See Pearle Vision v.

Romm (In re Romm)*, Nos. 05 B 46897, 06 A 69, 2006 WL 3692416, at *5 n.3 (Bankr. N.D. Ill.

Dec. 13, 2006).  Even in circuits taking a broader approach, a section 105 injunction is

considered an "extraordinary and drastic remedy," *In re Third Eighty-Ninth Assocs.*, 138 B.R.

144, 146 (S.D.N.Y. 1992), to be used only in "unusual circumstances," *Saxby's*, 440 B.R. at 379

(internal quotation omitted).

Those circumstances are not present here. Because the claims of the bankruptcy estates have not been shown to arise out of the same acts as the guaranty claims in the Delaware and New York actions, the debtors are not entitled to have the prosecution of those claims enjoined, whatever the effect on CEC's contribution to the reorganization.

### ii. The Insurance Argument

The debtors' second argument is based, not on the possible loss of the CEC contribution, but on the loss of coverage under the National Union insurance policy. According to the debtors, the $155 million in primary and excess coverage is an asset of their bankruptcy estates. If the Delaware and New York actions against CEC proceed to judgment, if those judgments are adverse to CEC, and if the insurers pay CEC's claims for the losses, the $155 million will disappear. To avoid this potential depletion of estate property, the debtors say, injunctive relief under section 105(a) is necessary.

The insurance argument runs up against the same obstacles as the CEC contribution argument – *Fisher* and *Teknek* – and suffers from the same flaw. The debtors have not shown that the estates' claims against CEC and the defendants' claims against CEC, claims that could theoretically be paid under the policies, arise out of the same acts. *Teknek*, 563 F.3d at 649; *Fisher*, 155 F.3d at 883. Without that showing, the defendants' claims cannot be enjoined.

Arguably, in fact, the debtors' insurance contention is weaker, and the circumstances even more remote from *Fisher* and *Teknek*, because the estates and the defendants do not appear to be competing for the same pool of assets (here, the insurance proceeds), as the trustees and creditors were in *Fisher* and *Teknek*. The policy has an "insured vs. insured" coverage exclusion

-29-

(here called an "entity v. insured" exclusion (P. Ex. 65 at 2961)).  Because the debtors and CEC

are insureds under the policy, the policy would appear not to pay losses resulting from the

estates' claims against CEC.  *Cf. Biltmore Assocs., LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663,

668-74 (9th Cir. 2009) (holding policy's "insured vs. insured" exclusion precluded coverage of

debtor's claims against its own directors and officers).  Nor does it appear the policy would pay

losses from most of the defendants' claims.  National Union notified CEC that breach of contract

and declaratory judgment claims are "generally held to be uninsurable," suggesting losses from

those claims would not be paid.  (P. Ex. 71 at 7).[18]

The debtors do not attempt to fit their insurance argument under *Fisher* and *Teknek* as

such.  They contend instead that the proceeds of the policy are property of their bankruptcy

estates.  Therefore, they say, the defendants' actions (if successful) will reduce the amount of

property in the estates and should be enjoined for that reason.

The debtors are mistaken.  Putting aside the prediction (a dubious one given the

substantial coverage problems) that the actions risk exhausting the insurance policy, the policy

proceeds are not property of the debtors' estates.[19]  An insurance policy a debtor holds on the

petition date (or more accurately the debtor's rights under the policy, *In re Forty-Eight*

---

[18]     National Union made this declaration in its letter to CEC only about the
MeehanCombs and Wilmington actions, but National Union's later letter about the Danner action
deemed the first letter applicable to that action.  (P. Ex. 72 at 2).  National Union did
acknowledge coverage of the MeehanCombs and Danner actions as "securities claims."  By that,
though, National Union was presumably referring to the TIA claims in those actions, since
National Union reserved rights concerning the Wilmington action, and the Wilmington complaint
has no TIA claim.

[19]     If they were, the debtors would not need an injunction under section 105(a) to
protect them.  The automatic stay under section 362(a)(3), 11 U.S.C. § 362(a)(3), would serve
that purpose.  *See In re Petters Co.*, 419 B.R. 369, 375 (Bankr. D. Minn. 2009); *In re Arter &
Hadden, L.L.P.*, 335 B.R. 666, 671 (Bankr. N.D. Ohio 2005).

*Insulations, Inc.*, 133 B.R. 973, 977 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992))

becomes property of the debtor's bankruptcy estate, *In re Stinnett*, 465 F.3d 309, 312 (7th Cir.

2006); *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 748 (7th Cir. 1989). But that

does not mean the proceeds of the policy also become property of the estate. *Mazzolin v.*

*Lehman Bros Real Estate Fund III*, No. 11 C 953, 2012 WL 245192, at *3 (N.D. Ill. Jan. 25,

2012); 5 *Collier on Bankruptcy, supra,* ¶ 541.10[1] at 541-53.

Whether policy proceeds are estate property depends on the nature of the policy. *In re*

*Equinox Oil Co.*, 300 F.3d 614, 618 (5th Cir. 2002); *In re Gladwell*, No. 06-82063, 2009 WL

140098, at *2 (Bankr. C.D. Ill. Jan. 21, 2009). This is especially true of directors and officers

liability insurance is concerned. *See Arter & Hadden*, 335 B.R. at 671 (noting the "'discord'" in

the case law (quoting *In re Medex Reg'l Labs., LLC*, 314 B.R. 716, 720 (Bankr. E.D. Tenn.

2004)). As a rule, courts find that proceeds of a policy providing coverage only to the debtor are

property of the estate, and proceeds of a policy providing coverage only to directors and officers

are not. *Petters*, 419 B.R. at 376. After that, however, the outcome becomes less clear. *Id.*; *see*

*also In re Vitek*, 51 F.3d 530, 535 (5th Cir. 1995) (noting the problem but declining to address it).

Here, the outcome follows from the unusual breadth of the National Union policy. The

insureds under the policy include not only CEOC and its directors and officers but also CEC and

its directors and officers (not to mention CEC's other subsidiaries and their directors and

officers). The policy extends coverage not only to the directors and officers themselves and to

CEC, CEOC, and CEC's other subsidiaries (to the extent they indemnify directors and officers

for losses), but it also provides identical "organization coverage" (usually called "entity

coverage," Susan N.K. Gummow, *Bankruptcy & Ins. Law Manual* 132 (2d ed. 2007)) to CEC,

CEOC, and CEC's other subsidiaries. CEC therefore has the same "organization coverage"

under the policy that CEOC and the other debtors have.

Because it does, CEC has independent rights to the policy proceeds, rights that are CEC's property alone. *See Petters*, 419 B.R. at 376 (recognizing that "any individual insured has a contractually-distinct status that runs directly between itself and the insurer," so that "the right to receive payment on a covered claim [is] the property of that insured itself"); *Forty-Eight Insulations*, 133 B.R. at 977. As an additional insured, CEC is entitled to exercise its rights under the policy, notwithstanding the bankruptcy, and can do so until the policy limits are exhausted. *St. Paul v. Home Depot*, Nos. 03 50389, 03 C 50390, 2004 WL 2075129, at *2 (N.D. Ill. Sept. 14, 2004); Gummow, *supra*, at 165-66.

The debtors' rights under the National Union policy are estate property, true enough, *Forty-Eight Insulations*, 133 B.R. at 977, but that does not mean they trump CEC's rights, making the policy proceeds untouchable, *id. at* 978; *see also In re SportStuff, Inc.*, 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010); *In re Spaulding Composites Co.*, 207 B.R. 899, 907 (B.A.P. 9th Cir. 1997); *St. Paul*, 2004 WL 2075129, at *2. To find otherwise, allowing the debtors to hold up payments for CEC's losses in favor of the debtors' own, would give the debtors rights under the policy they did not have before these cases were filed. It is a truism that the Code does not grant debtors rights greater than they had outside of bankruptcy. *Hills Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 592 (9th Cir. 1993); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989). Given non-debtor CEC's equal and independent right to the policy proceeds, those proceeds are not property of the debtors' estates.

Because the bankruptcy estates and the defendants have not been shown to have claims arising out of the same acts, that could be paid with the proceeds of the insurance the debtors share with CEC, and because the insurance proceeds are not property of the bankruptcy estates,

the debtors are not entitled to have the defendants' actions in Delaware and New York enjoined.

## 4. Conclusion

The motion of debtors Caesars Entertainment Operating Co. and subsidiaries to stay, or in the alternative, for injunctive relief is denied to the extent that the motion seeks an injunction under section 105(a) of the Bankruptcy Code halting the prosecution of civil actions pending against non-debtor Caesars Entertainment Corp. in the Delaware Court of Chancery and the U.S. District Court for the Southern District of New York. The balance of the motion is denied as moot. A separate order will be entered consistent with this opinion.

Dated:  July 22, 2015

A. Benjamin Goldgar
United States Bankruptcy Judge