# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 15-01145 (ABG)<br><br>(Jointly Administered) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*,<br><br>        Plaintiff,<br><br>    v.<br><br>BOKF, N.A., WILMINGTON SAVINGS FUND SOCIETY, FSB, RELATIVE VALUE-LONG/SHORT DEBT PORTFOLIO, A SERIES OF UNDERLYING FUNDS TRUST, TRILOGY PORTFOLIO COMPANY, LLC, AND FREDERICK BARTON DANNER,<br><br>        Defendants. | Chapter 11<br><br>Adversary Case No. 15-00149 |

## UNSECURED NOTES DEFENDANTS'[2] OBJECTION TO DEBTORS' MOTION TO EXTEND THE SECTION 105 INJUNCTION ENJOINING DEFENDANTS FROM FURTHER PROSECUTING THEIR GUARANTY LAWSUITS

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

[2] The Unsecured Notes Defendants are, collectively, Relative Value-Long/Short Debt Portfolio, a Series of Underlying Funds and Trilogy Portfolio Company, LLC ("Unsecured Notes Defendants").

The Unsecured Defendants respectfully submit this objection (the "Objection") to the

Debtors' Motion to Extend the Section 105 Injunction Enjoining Defendants from Further

Prosecuting their Guaranty Lawsuits [Dkt. No. 284] (the "105 Extension Motion") and state as

follows:

## INTRODUCTION AND BACKGROUND

Justice delayed is justice denied.  For a third time the Debtors seek to enjoin the

prosecution of a law suit against a nondebtor, the outcome of which will have absolutely no

impact on the Debtors' restructuring.  The August Transaction Litigation (defined below) seeks a

judgment against CEC in the amount of $13.8 million plus interest, and is premised upon what is

colloquially referred to as the "Senior Unsecured Notes Transaction," which this Court detailed

in its original opinion.  *See Caesars Entertainment Operating Co., Inc. v. BOKF, N.A. (In re

Caesars Entertainment Operating Co., Inc.*), 533 B.R. 714, 722-23 (Bankr. N.D. Ill. 2015).

When the Court last addressed this issue, it advised the parties that, as long as the

Unsecured Notes Defendants did not refuse to "participate[] in extensive, good faith

negotiations," the "August 29 expiration date [of the injunction] should accordingly be

considered a deadline to reach a resolution."  Order Granting Plaintiffs' Emergency Motion for

Temporary Restraining Order and Preliminary Injunction [Dkt. No. 274] ("June 15 Order").

There can be no dispute that the Unsecured Notes Defendants initiated and participated in good

faith in mediation following the entry of the June 15 Order.  Notwithstanding, the parties have

not reached a settlement and, as of the date of the hearing on the 105 Extension Motion, the

mediation will have concluded by mutual agreement.  Accordingly, the Court should deny the

105 Extension Motion and allow the Unsecured Notes Defendants to pursue their claims against

non-debtor Caesars Entertainment Corporation ("CEC").[3]

## ARGUMENT

### I.    The Mediation Has Not Resulted in a Settlement.

Mindful of the Court's admonition in the June 15 Order that "further [injunctive] relief

will indeed be considered if it appears that despite the overtures of the debtors and CEC the

parties have not participated in extensive, good-faith negotiations," the Unsecured Notes

Defendants reached out to the Honorable Joseph J. Farnan, Jr., the mediator, and counsel for

CEOC and CEC on June 17, 2016 and indicated that the Unsecured Notes Defendants remain

ready and willing to participate in mediation.  The Unsecured Notes Defendants followed up

with Judge Farnan and counsel on July 5.   An initial mediation session was finally held on

August 2 and a second session was conducted on August 16.   However, while the Unsecured

Notes Defendants have participated in two mediation sessions with the Debtors' professionals

and CEC, the parties' discussions cannot fairly be characterized as an "active dialogue."  105

Extension Motion at 3.  Indeed, neither CEC nor CEOC's principals bothered to show up for the

first mediation session, and no principals for CEOC, only counsel and advisors, have participated

in either of the two sessions.  Furthermore, contrary to the Debtors' assertion, counsel for the

Unsecured Notes Defendants has had one conversation with the mediator outside of the

---

[3] Despite the upcoming oral argument (currently scheduled for August 30, 2016) in the Unsecured Notes Defendants' suit against  CEC in the United States District Court for the Southern District of New York (the "August Transaction Litigation"), no real urgency exists. Before the June 15 Order was entered and the initial oral argument was adjourned, Judge Rakoff provided the parties with a date by which he would rule on the summary judgment motions which was approximately 30 days after oral argument.  The Unsecured Notes Defendants would not object if CEC was to petition Judge Rakoff for a similar date certain for issuance of his ruling, such as September 30, so as to allow the parties additional time to negotiate with the benefit of a firm deadline.

mediation sessions, a far cry from the "almost daily discussions" the Debtors represented in their motion.  105 Extension Motion at 4.

Pursuant to the written agreement between CEOC, CEC and the Unsecured Notes Defendants, the mediation with the Unsecured Noteholders will terminate on August 22, 2016. While the Unsecured Notes Defendants have been negotiating in good faith—and indeed remain ready and willing to engage in any further mediation sessions before that date— no settlement is anticipated or contemplated before that date.

There is no support for the Debtors' assertion that the requested extension of the injunction enhances the prospect for a successful resolution of the parties' dispute.  The Debtors and CEC continue to treat the Unsecured Notes Defendants as an afterthought, perhaps because of the *de minimis* nature of their claim.  If the prosecution of the August Transaction Litigation is enjoined through confirmation, there is little doubt that the Debtors will abandon any pretense of wishing to negotiate, opting instead to push for confirmation of the proposed plan and approval of the third party release, the effect of which would be to release CEC from its guarantee of the 6.5% senior unsecured notes due 2016 (the "2016 Notes") and the 5.75% senior unsecured notes due 2017 (collectively, the "Senior Unsecured Notes") and moot the August Transaction Litigation.  Rather than increase the prospects of a consensual reorganization, the extension of the injunction will all but guarantee a contested confirmation hearing.  Whereas on the other hand, a determination in the August Transaction Litigation will provide much needed clarity regarding the strength of the Unsecured Notes Defendants' claims and CEC's defenses, thereby facilitating a resolution.

- 4 -

## II.  CEC Can Pay the Unsecured Notes Defendants and Still Make the Contemplated Contribution to the Debtors' Restructuring.

It is hornbook law that a section 105 application requires "case by case decisions as to whether any ***particular action*** excepted from the automatic stay will result in sufficient harm or interference with the bankruptcy case to warrant the issuance of a specific injunction." *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 599 (10th Cir. 1990) (quoting 2 Collier on Bankruptcy ¶ 105.02 at 105-7 - 9 (15th ed. 1990)) (emphasis added); *see also In re CCDC Fin. Corp.*, 135 B.R. 423, 425 (1992) (Bankr. D. Kan.) (same).  The legislative history of section 105 confirms this requirement: "[T]he court will have to determine whether a particular action which may be harming the estate should be stayed."  S. Rep. No. 989, 95th Cong., 2d Sess. 51 (1978). One example of the type of case-by-case analysis the Court must conduct can be found in *In re Saxby's Coffee Worldwide, LLC*, 440 B.R. 369 (Bankr. E.D. Pa. 2009) (when deciding whether to temporarily enjoin multiple actions pending against non-debtors, the court analyzed the potential impact of each individual action going forward on the debtors' reorganization).  This makes senses, because otherwise a debtor could file an adversary proceeding against multiple parties and only prove the elements of an injunction with respect to one defendant, but nevertheless obtain an injunction of all of the defendants' lawsuits.  Yet that is what the Debtors have repeatedly argued.

Notwithstanding the Debtors' attempt throughout this adversary proceeding to conflate the guarantee plaintiffs, the lawsuits the Debtors seek to further enjoin are not created equal. While the 105 Extension Motion is replete with references to the Official Committee of Second Priority Noteholders—which includes defendants WSFS and BOKF but not the Unsecured Notes Defendants—whom the Debtors misleadingly define as the "Noteholder Committee," the Unsecured Notes Defendants are mentioned exactly twice.  The reason for the lack of focus on

- 5 -

the Unsecured Notes Defendants is self-evident.  While WSFS, BOKF and UMB, as indenture

trustees collectively represent approximately $11 **billion** in first and second lien bonds, the

Unsecured Notes Defendants hold approximately $13.8 **million** in Senior Unsecured Notes.  *See*

Sixth Supplemental Verified Statement of Drinker Biddle & Reath LLP Pursuant to Federal Rule

of Bankruptcy Procedure 2019 [Case No. 15-01145, Dkt. No. 3422].

During the June 2016 evidentiary hearing on the Debtors' second request for a

preliminary injunction, counsel for the Debtors, Jeffrey J. Zieger, expressly acknowledged on the

record that "I don't think there is any dispute that CEC could pay a $14 million judgment."

Transcript of June 8, 2016 Hearing 163:23-24.  The Debtors themselves recently characterized,

in their request to pay the fees and expenses of Wilmington Trust, National Association, as

indenture trustee for CEOC's 10.75% unsecured subsidiary guaranteed notes, $11.5 million as "a

relatively minimal amount."  Debtors Motion for Entry of An Order (A) Authorizing the Debtors

to Pay the Reasonable and Documented Fees and Expenses of the Indenture Trustee for the

Debtors' 10.75% Subsidiary Guaranteed Senior Unsecured Notes and (B) Granting Related

Relief [Docket No. 4587] at 10.  In light of the foregoing, the Debtors cannot possibly

demonstrate that a judgment in the August Transaction Litigation, let alone its mere

continuation, would threaten CEC's financial ability to make the contemplated contribution

under the restructuring support agreement.

**III.    Judgment in the August Transaction Litigation Will Not Have a Preclusive Effect.**

The Unsecured Notes Defendants' claims are different from the indenture trustees'

claims, such that a decision on the Unsecured Notes Defendants' motion for summary judgment

will not have a preclusive effect on the WSFS, BOKF or UMB actions.   The Unsecured Notes

Defendants allege that CEC violated the Trust Indenture Act ("TIA") when it conspired with

certain favored noteholders to attempt to release CEC's guarantee that benefits the remaining

noteholders.  This resulted in favorable treatment for Goldman Sachs & Co. and the other

favored noteholders, on the one hand, and the purported stripping of CEC's guarantee of the

Senior Unsecured Notes without the Unsecured Notes Defendants' consent, on the other.

Congress enacted TIA Section 316(b) to prevent "[e]vasion of judicial scrutiny of the fairness of

debt-readjustment plans" and to "place a check or control over the majority forcing on the

minorities a debt-readjustment plan." A3274 (1939 House Report No. 76-1016); A3337-38

(1939 Senate Report No. 76-248); A2371 (1938 House Subcommittee Hearings).  These are the

very rights the Unsecured Notes Defendants are seeking to vindicate in the August Transaction

Litigation.

     The WSFS, BOKF and UMB complaints, by contrast, challenge the *bona fides* of two

May 2014 transactions pursuant to which the Debtors and CEC claim that the guarantees of the

first and second lien bonds were automatically released.  This Court detailed these claims in its

July 22, 2015 Opinion.  *See Caesars Entertainment Operating Co., Inc. v. BOKF, N.A. (In re*

*Caesars Entertainment Operating Co., Inc.*), 533 B.R. 714, 720 (Bankr. N.D. Ill. 2015)

     In these May 2014 transactions, CEC purportedly sold 5% of CEOC common equity to

certain institutional investors and purportedly gave away another 6% of CEOC common equity

to CEOC employees to reward performance.  The indenture trustees rely on an expansive

interpretation of the TIA, which nullifies any non-consensual actions taken in the context of an

"out-of-court reorganization."  Were the indenture trustees to prevail under that theory, every

guarantee plaintiff would likewise prevail against CEC on those grounds.  However, the same

cannot be said for the Unsecured Notes Defendants' TIA claims.  If Judge Rakoff finds that the

structure of the Senior Unsecured Noteholders Transaction violated the TIA, that decision will

only inure to the benefit of the Unsecured Notes Defendants, as holders of Senior Unsecured Notes.

There is no dispute that the claims are different.  In fact, CEC acknowledges the fundamental difference between the claims of the Unsecured Notes Defendants on the one hand and WSFS, BOKF and UMB on the other.  In its motion for summary judgment in the August Transaction Litigation, CEC states:

> The specified bases for the automatic release and structure of the provision differ from those in the indentures governing the notes at issue in the BOKF, UMB, and Wilmington Trust actions in two principal respects.  First, Section 1503 of the 2006 Indenture provides that "[CEC] shall be released from all of its obligations under the Guarantee with respect to Securities of any series and under this Indenture if" one of three conditions is satisfied, including if "[CEOC] ceases for any reason to be a 'wholly owned subsidiary' of [CEC] (as such term is defined in Rule 1-02(z) of the Regulation S-X promulgated by the SEC)." (¶ 5.)  That Rule (now codified at 17 C.F.R. § 210.1-02(aa)) defines a "wholly owned subsidiary" as a subsidiary "substantially all" of whose voting stock is owned by a parent. (¶ 6.)  This differs from the corresponding definition found in the indentures at issue in the BOKF, UMB, and Wilmington Trust actions, which specify that CEOC ceases to be CEC's "Wholly Owned Subsidiary" when it is no longer 100% owned by CEC.  See MEMORANDUM OF LAW OF CAESARS ENTERTAINMENT CORPORATION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, pg. 5.

Indeed, the Debtors do not deny that there would be no preclusive effect.  Rather, they argue that "the rights of the individual creditors have to yield to the efforts to achieve a reorganization that maximizes value for everybody."  Transcript of June 13, 2016 Hearing 288:15-18.  However, by "everybody" the Debtors really mean CEC, Apollo Global Management, LLC ("Apollo"), TPG Global, LLC ("TPG") and a host of other nondebtors that stand to receive enormous benefit from the Debtors' bankruptcy proceeding while the Senior Unsecured Noteholders have been denied their right to have their $14 million claims against CEC adjudicated in the Southern District of New York.

Further evidence of the significant difference between the August Transaction Litigation

and the claims of WSFS and BOKF is demonstrated by that certain Amendment to Guaranty and

Pledge Agreement effective as of August 21, 2015, by and among between CEC, Credit Suisse,

AG, Cayman Islands Branch, as Agent, and the Requisite Lenders (as such term is defined in that

agreement) which provides that in the event that any guarantee <u>exceeding</u> $250 million is

reinstated, the first lien guarantee shall be reinstated as well.  The $250 million carve out is

significant because only the Senior Unsecured Notes have a principal outstanding balance below

that threshold.  *See* Ex. A (Amendment to Guaranty and Pledge Agreement).

### IV.   The Debtors Have Not Shown That There is a Likelihood of a Successful Reorganization.

To obtain an injunction under section 105(a) of the Bankruptcy Code, the Debtors must

show, *inter alia*, that there is a likelihood of success on the merits, which in the bankruptcy

context means "the likelihood of successful reorganization."  *Caesars Entertainment Operating*

*Co., Inc. v. BOKF, N.A. (In re Caesars Entertainment Operating Co., Inc.)*, 533 B.R. 714, 729

(Bankr. N.D. Ill. 2015) (citing *In re Excel Innovations*, 502 F.3d 1086, 1095 (9th Cir. 2007);

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R.

571, 588–89 (Bankr. S.D.N.Y. 2009)).  The Debtors bear the burden of proving this element by

clear and convincing evidence.  *See In re Lancelot Investors Fund, L.P.*, Adv. No. 11-00646,

2011 WL 1465579, at *2 (Bankr. N.D. Ill. Apr. 15, 2011); *In re Paul R. Glenn Architects, Inc.*,

Adv. No. 12-1266, 2013 WL 441602, at*3 (Bankr. N.D. Ill. Feb. 5, 2013).  There has been no

evidence introduced in this adversary proceeding sufficient to meet this exacting standard.

In the 105 Extension Motion, the Debtors assert that they are likely to successfully

reorganize because:  (1) they have "a highly valuable gaming franchise"; (2) they have

"outperformed their budget" while in bankruptcy; and (3) there is "widespread creditor support"

for the plan.  105 Extension Motion at 12.  Conspicuously absent, however, from the 105
Extension Motion is any mention of the fact that the plan currently out for solicitation is
unconfirmable because it (i) violates the absolute priority rule; (ii) contains impermissibly broad
third party releases; and (iii) is conditioned upon a 105 injunction being in effect through
confirmation.

Article VIII of the Debtors' Second Amended Joint Plan of Reorganization Pursuant to
Chapter 11 of the Bankruptcy Code (the "Plan") provides for a broad release of civil liability of
numerous third parties, including CEC (the defendant in the August Transaction Litigation),
Apollo Global Management, LLC, Kirkland & Ellis LLP, Paul Weiss Rifkind Wharton and
Garrison LLP, CEC's and CEOC's directors and officers, and others involved in the Senior
Unsecured Noteholders Transaction.  Article I.E of the Disclosure Statement for the Debtors'
Plan [Dkt. No. 4220-1], titled "Plan Contingencies," underscores the importance of the third
party release to the Plan:

> To facilitate the substantial contributions that CEC is making in support of the
> Debtors' reorganization, the Plan is *predicated on*, and *dependent upon*, the
> settlement of all of the Debtors' claims and causes of action against, among
> others, the CEC Released Parties, as well as releases of certain claims third parties
> may have against, among others, the CEC Released Parties.  Such releases
> include, among other things, any claims and causes of action related to CEC's
> purported guarantees of the Debtors' funded debt obligations, which are subject to
> the Pending Guarantee Litigation …. If CEC's guarantee obligations are
> reinstated in the Parent Guarantee Litigation, there is a material risk that CEC
> may be unwilling or unable to make the contributions contemplated by the Plan.

Disclosure Statement at 12 (emphasis added).  The Debtors thus concede that approval of
the third party release is a prerequisite to their successful reorganization.

In the Seventh Circuit, the bankruptcy court may only approve the nonconsensual
release of a third party if it determines that the release is "appropriate" and not
inconsistent with any provision of the Bankruptcy Code.  *Airadigm Commc'ns, Inc. v.*

- 10 -

*FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 657 (7th Cir. 2008). Ultimately, "whether a release is 'appropriate' for the reorganization is fact intensive and depends on the nature of the reorganization." *Id.* In *Airadigm*, the court determined that the release "was necessary for the reorganization and appropriately tailored." *Id.* Specifically, the release was "narrow" in that it applied only to claims arising out of or in connection with the reorganization and excluded willful misconduct. *See id.* The court also noted that the release did not provide "blanket immunity" for all times and all transgressions. *See id.* Nor did the release impact matters beyond the jurisdiction of the bankruptcy court or unrelated to the reorganization itself. *See id.* In a later ruling on third party releases, the Seventh Circuit "preached caution" because a third party release is a "device that lends itself to abuse." *In re Ingersoll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009) (internal citation omitted).

The Debtors have not introduced any evidence to date as to whether or not the third party release is "appropriate" under the *Airadigm* test. Far from being "narrow," the third party release contemplates the type of "blanket immunity" the Seventh Circuit cautioned against. The third party release is not limited to claims arising out of the restructuring and contains no carve out for willful misconduct. The majority of the entities and individuals receiving the benefit of the release are not making any contribution whatsoever to the Debtors' reorganization. Unless and until the Debtors demonstrate the third party release on which the Plan is predicated and dependent will be approved, they have not proven that a successful reorganization is likely.

Furthermore, the First Amended and Restated Restructuring Support, Settlement and Contribution Agreement between CEOC and CEC, dated as of July 9, 2016 (the

"CEC RSA"), provides that it will terminate automatically fourteen days after the

expiration of any stay of the guarantee actions.  While the Debtors filed numerous

iterations of a plan of reorganization (and related disclosure statement) premised on a so-

called "contribution" to the Debtors' estates by CEC, not until June 7, 2016, when the

Debtors disclosed that they had formally entered into a restructuring support, settlement

and contribution agreement with CEC, was CEC's "contribution" made conditional upon

an injunction of the guarantee lawsuits continuing in effect through confirmation of the

proposed plan.  This termination provision renders the entire CEC RSA so conditional

that the Court cannot assume that the proposed funding will actually be available for the

Debtors to use to fund the Plan.  Another court faced with a similar version of bankruptcy

blackmail determined:  "[T]he Guarantors have until now conditioned this infusion of

capital on Chase's release of the Guaranty and some of its interests in the Monarch, a

proposal decisively rejected by Chase.  The conditional nature of the infusion casts

serious doubt on whether any funds actually are available to the Debtor for use in the

reorganization."  *In re Third Eighty-Ninth Assoc.*, 138 B.R. 144, 149 (S.D.N.Y. 1992)

(citing *Costa and Head Land Co. v. Nat'l Bank of Commerce (In re Costa and Head Land
Co.)*, 68 B.R. 296, 301-02 (N.D. Ala. 1986)).

   V.    **The Balance of Harms and the Consideration of the public interest
         weighs against the issuance of an injunction.**

   The other factors relevant to the issuance of a section 105 injunction—the balance of the

relative harms and the public interest—do not support enjoining the August Transaction

Litigation.  A section 105 injunction is an equitable remedy, and a party must act equitably in

order to obtain the benefits of an equitable remedy.

The Unsecured Notes Defendants will be disproportionately harmed by the issuance of an injunction, in that they will effectively be denied the right to litigate their claims against CEC and seek enforcement of the guarantee through confirmation, at which time the Debtors will attempt to permanently extinguish the claims, while the Debtors' restructuring efforts will not be affected if the August Transaction Litigation proceeds. The Debtors have conceded that CEC can satisfy a judgment in the August Transaction Litigation and still make the contemplated contribution. The Unsecured Notes Defendants have already had to endure the cost and expense of three preliminary injunction trials, as well as the cost of preparation required for trial and oral argument in the Southern District of New York. The Unsecured Notes Defendants have spent millions of dollars simply defending their right to proceed to trial against a non-debtor, on claims that will not impact the Debtors' reorganization.

Public policy also disfavors an injunction. *See In re Caesars Entertainment Operating Co., Inc.*, 533 B.R. at 728 (the Debtors must show that "the injunction would serve the public interest"). Through the injunction, CEC, as well as Apollo, TPG and other entities behind it, are, via the Debtors, attempting to obtain the benefits and protections of chapter 11 without assuming its burdens. If CEC wishes to have a single forum to deal with its creditors, it should file a chapter 11 petition of its own. Instead, CEC is hoping to buy a release, without exposing itself, its directors and officers, and equity sponsors to claims of a CEC bankruptcy estate. With respect to Apollo, TPG and other CEC-related entities, there has been no showing that they are contributing anything to the reorganization or that they would be impacted in any way by the continuation of the August Transaction Litigation. Under the circumstances presented here, the public interest does not support an injunction. *See In re Costa and Head Land Co.*, 68 B.R. at 303 (N.D. Ala. 1986) (holding that the public interest did not support a stay where the non-

- 13 -

debtors "have conspicuously not sought [the] protection [of the bankruptcy laws]"); *see also*

*Raleigh v. Illinois Dep't of Revenue*, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) ("Bankruptcy courts

are not authorized in the name of equity to make wholesale substitution of underlying law

controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code

itself provides.") (internal citations omitted).

As Your Honor has recognized, this is not the textbook case the Debtors claim it is.  In

the textbook case, the injunction halts litigation against a debtor's guarantor who intends to make

a financial contribution to the reorganization.  To be clear, CEC is <u>not</u> making a financial

contribution to the Debtors' reorganization.  A financial contribution is a payment that is not

otherwise required, but is provided voluntarily.  Here, CEC is paying on account of claims that

have been asserted against it.  Moreover, the value of those claims dramatically exceeds CEC's

settlement payment.  Under the Debtors' theory, any avoidance action defendant would be

entitled to an injunction to prevent third party litigation from proceeding that might impact that

defendant's ability to make restitution to the bankruptcy estate.

## CONCLUSION

For the foregoing reasons, the Court should deny the 105 Extension Motion, and grant

such other and further relief as the Court deems just and proper.


Dated:  August 19, 2016                    Respectfully submitted,
        Chicago, IL

                                           **DRINKER BIDDLE & REATH LLP**

                          By:    */s/ Timothy R. Casey*
                                 Timothy R. Casey (ARDC # 6180828)
                                 191 N. Wacker Drive, Ste. 3700
                                 Chicago, IL 60606
                                 Telephone: (312) 569-1201
                                 Facsimile: (312) 569-3201
                                 timothy.casey@dbr.com

                                 -and-

                                 James H. Millar
                                 Kristin K. Going (admitted *pro hac vice*)
                                 1177 Avenue of the Americas
                                 41st Floor
                                 New York, NY 10036
                                 Telephone:  (212) 248-3140
                                 Facsimile:  (212) 248-3141
                                 james.millar@dbr.com
                                 kristin.going@dbr.com

                                 *Counsel to Relative Value-Long/Short Debt Portfolio, a*
                                 *Series of Underlying Funds Trust, and Trilogy Portfolio*
                                 *Company, LLC*