# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re:<br>CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*,[1]<br>*Debtors*. | Chapter 11<br>Case No. 15-01145 (ABG)<br>(Jointly Administered) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*,<br>*Plaintiffs*,<br>v.<br>BOKF, N.A., *et al*.<br>*Defendants*. | Chapter 11<br>Adversary Case No. 15-00149<br>**Hearing Date: August 23, 2016, at 9:00 a.m.** |

## OBJECTION OF WSFS TO DEBTORS' MOTION TO EXTEND THE SECTION 105 INJUNCTION REGARDING GUARANTY ACTIONS

Defendant Wilmington Saving Fund Society, FSB ("WSFS") objects to the *Debtors' Motion To Extend The Section 105 Injunction Enjoining Defendants From Further Prosecuting Their Guarantee Lawsuits* [ECF 284] (the "Motion"). Capitalized terms not defined in this Objection have the meanings given in the Motion.

---

[1] A complete list of the Debtors may be obtained at https://cases.primeclerk.com/CEOC.

I.  **PRELIMINARY STATEMENT**

1. The Motion requests that the Court extend through confirmation an injunction prohibiting WSFS and BOKF, N.A. (the "<u>Trustees</u>") from enforcing rights issued by non-debtor CEC. The Debtors' explicit goal is to increase their leverage to impose on Second Lien Noteholders the terms of a Plan, including by cramdown, that would release the CEC guarantees and valuable claims against scores of CEC insiders and affiliates for no consideration. Such an extension would be inequitable and counterproductive.

2. As the Mediator explained, the Trustees negotiated extensively and in good faith since the Court issued the injunction on June 15. Unfortunately, there has been no resolution of the disputes respecting Second Lien Notes despite those efforts, and there is no basis to extend the injunction any further. ECF 274 ("<u>Op.</u>") at 5-6 ("[T]he likelihood any further injunctive relief will be granted is small. The August 29 expiration date should accordingly be considered a deadline to reach a resolution."); *id.* at 2 ("the chances of further injunctive relief are slim"); *id.* at 5 ("a short injunction with a clear termination date and little chance of extension").

3. The Court indicated that it would consider another injunction "if it appears that despite the overtures of the debtors and CEC the parties have not participated in extensive, good-faith negotiations." *Id*. at 6. The Debtors, however, concede the point in the Motion, and the Mediator has confirmed it. The Debtors, CEC and the Noteholder Committee (including the Trustees as members) have had four in-person mediation sessions, with "frequent and extensive discussions among principals and advisors for the Debtors, CEC and its affiliates and the Noteholder Committee, as well as among principals and advisors for these parties and the mediator." Mot. ¶ 4. Just last Wednesday (August 17), the Noteholder Committee made itself available for additional settlement conferences prior to the upcoming hearing, but CEC declined to participate. The Debtors cannot credibly allege that the Trustees refused to negotiate.

- 1 -

4. Rather than treating the injunction as a deadline, the Debtors immediately bound themselves to request an extension – on terms dictated by CEC – through confirmation, regardless of merit and heedless of the Court's warning.  Ex. A ("CEC RSA") at § 3(a)(iii). They previously requested a short injunction with "[t]he hope . . . that the [Examiner's] report might help the parties negotiate a reorganization of the bankrupt estate." *Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 808 F.3d 1186, 1188 (7th Cir. 2015).  The prospect of *settlement* was the premise of both of the Court's prior injunctions. But the Debtors now ask for an injunction all the way through confirmation – five months or more.  This is not an effort to gain time to negotiate a settlement.  It is an explicit request to pressure the Trustees with "the risk of a contested confirmation hearing," Mot. ¶ 14; *id.* ¶ 39, while protecting CEC from its guarantees, relief the Court twice declined to grant.

5. The Debtors argue that the Court made a mistake in limiting the duration of the injunction, euphemistically describing "[a]n unfortunate byproduct of the Court's June injunction," and they say they want to "rebalance" leverage. *Id*. ¶¶ 14, 23, 31.  But any progress in mediation was accomplished precisely *because* the Court set a deadline, at the expiration of which all parties would face litigation risk.  Negotiations occurred because the Court made clear that the injunction would not last indefinitely.  The statement issued by the Mediator does not state that an injunction would benefit further negotiations, expresses no concern about an imbalance of leverage, and says nothing about any need to "rebalance" negotiation positions.  At deposition yesterday, the Debtors' lead negotiator and sole witness – Mr. Hayes of Millstein – disavowed the assertion that negotiating leverage is unbalanced.

6. The Motion is an inequitable attempt to tilt the scales in favor of CEC and its Sponsors.  The Debtors hope to put all risk on the Trustees, forcing them to confront a cramdown

plan that would eliminate estate claims for an inadequate "contribution" from CEC, destroy the guarantees without compensation, and release a multitude of CEC insiders and affiliates (including sixty-six other defendants named in the complaint recently filed by the Debtors) for no consideration, while insulating CEC from threat of an adverse judgment as it lobbies Congress vigorously to amend the Trust Indenture Act in furtherance of that same goal. The Debtors also want to continue to prosecute objections to the Trustees' claims, and a preference action seeking avoidance of the Trustees' liens, while prohibiting the Trustees from recovering anything from CEC. As the Court observed on Wednesday, there is no "shared pain" here.

7. The Debtors assert that a cramdown would be "a successful resolution of disputes in this case" because "[d]isputes, after all, can be resolved through settlement or the courts." *Id.* ¶ 13. This disrespects the Court's prior ruling. "The purpose of granting injunctive relief here [wa]s to facilitate a *negotiated* resolution of the disputes in this case." Op. at 5 (emphasis added). "The purpose [wa]s *not* to give the debtors and CEC an opportunity to avoid negotiations and then at confirmation cram a plan down on the second lien noteholders." *Id.* (emphasis in original). Yet that is exactly the relief the Debtors now seek.

8. The Court noted previously that, "[w]ithout a deadline in this case, . . . the debtors and CEC would have little incentive to talk. They could sit back and take their chances at confirmation." *Id.* "[D]eadlines, not uncertainty alone, spur settlement." *Id.* That remains true. The last, best shot at a truly consensual resolution of this case lies in the period between now and the real "deadline" – the upcoming summary judgment hearings in the guarantee litigation. If the Court denies the Motion at the hearing, the ensuing six days are certain to be the most productive of the case. WSFS urges the Court to do so or, at a minimum, to refrain from ruling until the eve of the summary judgment hearing in order to keep equal "pressure" on all.

9. If the Court concludes that an extension is warranted, the new injunction should not run through confirmation. Mr. Hayes of Millstein testified yesterday that a deal with the Noteholder Committee "could be done over the course of a month." Accordingly, any extension should be limited to thirty days, with a real and meaningful deadline, and accompanied by a concurrent extension of all deadlines associated with confirmation. Only then will negotiating leverage be "balanced" (among other things, by giving the New York and Delaware courts presiding over the guarantee actions the same amount of time as they now have to resolve those cases before confirmation) and parties positioned to reach a fair and equitable compromise.

## II.   THE ALLEGED PROGRESS DOES NOT WARRANT AN EXTENSION

10. Ignoring what the Court wrote in June, the Debtors assert that "[t]he injunctions have served their intended purpose" because "the Debtors have made substantial progress towards a fully consensual plan." Mot. ¶ 1. They claim this justifies yet another injunction, which the Debtors' lawyers (but not their witness) say will "rebalance" negotiating leverage and facilitate a "resolution" (defined to include a cramdown confirmation). Except for the suggestion that an injunction will lead to contested confirmation, the Debtors are wrong. Another injunction only will tilt the scales inequitably in favor of CEC and the Sponsors, continuing the entrenchment the Court predicted in its opinion.

### A.   Most Of The "Progress" Was Unrelated To The Injunction.

11. Virtually all of the "progress" cited by the Debtors occurred before or shortly after the Court issued the injunction on June 15. The SGN and CEC RSAs were signed on June 7; the CAC RSA was signed on June 12; the first lien bank RSA was signed on June 20; and the UCC RSA was signed on June 22, confirming the "agreement in principle" heralded at trial and mentioned by the Court. Mot. ¶ 1; Op. at 3. The Debtors' alleged "expect[ation] [that] first lien noteholders will continue to support the overall deal," Mot. ¶ 1, is regression (not progress) from

- 4 -

trial testimony that "the debtors had an agreement in principle, soon to be executed, with the first lien noteholders," Op. at 3. With the exception of Danner (holder of $10,000 claim), the Debtors reached no new binding agreements during the injunction period. The Debtors' claim "that $14 billion of their $18 billion capital structure currently supports the Debtors' proposed restructuring," Mot. ¶ 2, is no different than their claims at trial.[2] The needle has not moved.

12. All of this was considered by the Court in concluding that a seventy-four day injunction was enough. Op. at 3. It is not progress *resulting from* the injunction. Neither is the fact that the various RSAs "went effective" shortly after the injunction was entered. Mot. ¶ 2. Those deals were cemented before the injunction, which did nothing to advance the ball. Similarly, the Debtors' improved financial performance (*id*. ¶ 7) and the filing of a complaint against CEC and other insiders in an effort to fend off the Noteholder Committee's standing motion (*id*. ¶ 9) cannot plausibly be attributed to the injunction.

13. The Debtors did settle with Danner during the injunction period. But Danner holds a claim of less than $10,000 and faced the prospect of having his motion for class certification denied. In exchange for resolving that claim, CEC and the Debtors agreed to pay Danner's lawyer up to $7 million in fees and expenses, plus up to $100,000 a month for the rest of the case. The resolution of Danner's claim will not produce any broader consensus.

    **B.**    **"Progress" With Second Lien Noteholders Happened Because Of The Deadline Set By The Court.**

14. That leaves the Second Lien RSA. The Debtors concede that the agreement is not effective. Mot. ¶¶ 1, 2, 5. It has been signed by holders of only 27% of Second Lien Notes but

---

[2] The claim also is misleading. The $14 billion figure includes *all* of the first lien noteholders (none of which are subject to a binding RSA), *all* of the first lien banks (despite the fact that some have not signed an RSA), and *all* of the subsidiary guaranteed noteholders (despite the fact that some have not signed an RSA).

cannot become effective unless a majority execute it. *Id*. ¶ 2. That will never happen because a majority of Second Lien Noteholders have signed a Cooperation Agreement in which they agreed not to do so. Ex. B ("Amended Cooperation Agreement") § 1. The new Second Lien RSA is no more meaningful than the aborted one announced with fanfare a year ago but abandoned two months later.

15. The Second Lien RSA also does not represent much progress even as to the parties that executed it. For one thing, those minority noteholders have significant investments in other parts of the Caesars capital structure – including holdings of CEC and CAC equity that would decrease in value if they make reasonable settlement payments to the estate.[3] The interests of those crossover shareholders are in conflict with the broader class of Second Lien Noteholders. They favor *any* resolution of the Debtors' claims against CEC and CAC over one that maximizes the distribution on Second Lien Notes. The fact that no one without an equity interest in CEC or CAC signed the Second Lien RSA speaks volumes.

16. Another reason is that those conflicted shareholders were showered with a multitude of inappropriate "fees" to be paid by CEC outside of the Plan, including:

- A "Stay Fee" equal to 4% of the Second Lien Notes held by each consenting noteholder – more than $220 million if the Debtors' report of a 27% acceptance rate is accurate. Ex. C ("Second Lien RSA") at §§ 1(a), 4(b).

- A "Consensual Deal / Plan Confirmation Fee" equal to 5% of the Second Lien Notes held by each consenting noteholder – an additional $275 million assuming a 27% acceptance rate. *Id.* §§ 1, 37.

- Payment of up to $1 million in accrued fees and expenses, plus payment of ongoing fees and expenses. *Id.* §§ 1, 5(a)(v), and 5(a)(vi).

---

[3] This was known at the time of the last trial. 6/9/16 Tr. 31:11-14 ("Q: Can you name any second priority noteholders who do not also own CEC or CAC equity who support the plan? A: Not today.") (Millstein).

- Up to $15 million in "Forbearance Fees" provided for under the *First Lien Notes RSA* (which is not even effective) in respect of the First Lien Notes held by the shareholders. *Id.* § 5(d)(ii).[4]

The injunction was intended to facilitate a global resolution, not CEC's efforts to coerce acceptance through "death trap" agreements with selective, one-off payments.

17. The Second Lien RSA also lacks funding commitments. Even though distribution of new CEC stock is the basis of the "deal," the parties have not agreed on who will contribute such equity. *Id.* § 10(f) (termination if parties "have not agreed on the source of the New CEC Common Equity . . . to be received by holders of claims in Classes F, H, I, J, K and L"). Nor could they agree on amounts (if any) to be contributed by entities other than CEC and its affiliates. *Id.* § 8(r) (termination "if the Non-Caesars Contribution Amount is not reasonably satisfactory to the Requisite Consenting Second Lien Creditors"). The Second Lien RSA obviously was rushed out to demonstrate a modicum of progress during the injunction period.

18. WSFS acknowledges the Mediator's statement that "recoveries available" through the Second Lien RSA "reflect a significant step forward by CEC toward a resolution with other second lien noteholders, and have served as a helpful springboard to continued negotiations and a potential consensual resolution." ECF 293 at ¶ 2. WSFS commends the Mediator for his tireless effort and optimism. And, if one focuses solely on the headline recovery number of 55% touted in the Motion (¶ 1), and ignores the conditions flagged by the Mediator, that is a higher recovery than anything ever offered to Second Lien Noteholders generally. (Mr. Hayes testified that there have been no proposals to the Noteholder Committee since execution of the Second Lien RSA.) WSFS notes, however, that any "progress" resulting from the Second Lien RSA

---

[4] The Danner RSA similarly includes improper fees to be paid by CEC, outside of the Plan, only to the subset of creditors who vote to accept the Plan. Those fees are illegal, *e.g.*, *In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010), but that is an issue for another day.

- 7 -

occurred in August in the looming shadow of the Court's August 29 deadline. The Court was prescient in observing that "[d]eadlines produce settlements because they force parties to compromise in order to avoid the risk that a blissful uncertainty will become a distasteful certainty." Op. at 5. An extension of the injunction would prolong that period of "blissful uncertainty" and diminish the prospects for a consensual resolution.

### C. The Trustees Negotiated In Good Faith.

19. The Court wrote that it would consider further relief "if it appears that despite the overtures of the debtors and CEC the parties have not participated in extensive, good-faith negotiations." Op. at 6. As confirmed by the Mediator, there is no question that the Trustees and Noteholder Committee negotiated in good faith. Mr. Hayes, the Debtors' lead negotiator, admitted this as well. The failure to reach a deal is not from lack of trying by the Trustees. If it was, the Mediator was empowered to say so and undoubtedly would have, just as he called out CEC's failure to negotiate in advance of the trial in June.

20. The Debtors insinuate that the original Cooperation Agreement signed by a majority of Second Lien Noteholders in early July reflects a refusal to negotiate. Mot. ¶ 5. The Motion belies that suggestion, as it reveals that three additional mediation sessions and "frequent and extensive discussions" occurred after that time. The first Cooperation Agreement related to the Debtors' current Plan, and its signatories confirmed that they would vote to reject that Plan, a fact known to all. Ex. D § 1. They "support[ed] the Noteholder Committee's efforts to negotiate a settlement in the Bankruptcy Cases on behalf of holders of Second Priority Notes." *Id.* at 2.

21. The same is true of the Amended Cooperation Agreement executed a month later. The signatories simply reaffirmed their agreement to reject the current Plan and agreed not to sign the Second Lien RSA. Amended Cooperation Agreement § 1. Once again, they "support[ed] the Noteholder Committee's efforts to negotiate a settlement in the Bankruptcy

- 8 -

Cases on behalf of holders of Second Priority Notes" and made clear that their commitments "only apply to the Plan and the 2L RSA" and that "nothing in this Agreement shall preclude any Party from voting in favor of any other plan of reorganization." *Id.* at 2, § 1.

22.     In contrast to the Debtors' various RSAs – including the ineffective Second Lien RSA – neither Cooperation Agreement restricts signatories from negotiating better deals.  To the contrary, the agreements encourage negotiation.  They were executed in response to the Debtors' assertion that a majority of holders agreed with the Plan as proposed, including Mr. Millstein's testimony that "the number of second lienholders who will vote for this plan is grossly underreported."  6/9/16 Tr. 31:22-24 (Millstein).  Had that testimony not been discredited, it might have emboldened CEC to stand firm.  The agreements also addressed CEC's effort to coerce support through improper fees available only to those who signed the Second Lien RSA lock up.  The majority's announcement of opposition removed the incentive for noteholders to sign out of fear that they would miss out on the new fees.

    **D.  There Is No Need To "Rebalance" Negotiating Leverage.**

23.     Finally, the suggestions (by the Debtors' lawyers) that the Court erred in setting a deadline for the injunction, and that negotiating leverage needs to be rebalanced, are unfounded.  The Debtors assert that "[t]he Committee's incentive is to *not* reach a settlement during the injunction period, since the Court has stated a further injunction is unlikely and the prospect of imminent guaranty judgments means the Noteholder Committee will not have to face the risk of losing a contested Plan confirmation hearing."  Mot. ¶ 14 (emphasis in original); *see id*. ¶ 23 ("the Noteholder Committee holds all of the cards in the negotiations").  But this is preposterous.

24.     To start, the Debtors' lead negotiator and sole witness – Mr. Hayes of Millstein – testified yesterday that the Noteholder Committee does *not* have "undue negotiating leverage."  The allegation in the Motion has no factual basis.  And the Trustees and Noteholder Committee

- 9 -

strongly desire a consensual settlement, a fact evidenced by their extensive and ongoing negotiations. Without a settlement, they are exposed to substantial risk on numerous fronts, including the risk of a cramdown Plan, the risk of an adverse decision in the guarantee actions, the risk of ongoing lobbying to dismantle the Trust Indenture Act, the risk of disallowance of their claims against the subsidiary debtors, the risk of disallowance of alleged original issue discount on the Second Lien Notes, and the risk of avoidance of liens in the preference action.

25. Currently, the only party with "undue negotiating leverage" is CEC. It has been sheltered from risk in the guarantee actions. With a further injunction, "the debtors and CEC would have little incentive to talk. They could sit back and take their chances at confirmation." Op. at 5. There is nothing "balanced" about that. The Court recognized that the injunction "imbalances" leverage *against* the Trustees: "The guaranty plaintiffs do raise legitimate concerns about an 'imbalance' in negotiation if an injunction is entered – if, while their hands are tied, the debtors continue to litigate full bore against them in the bankruptcy cases, or if the Trust Indenture Act . . . is amended retroactively to erase those claims. But a reasonable degree of balance can be restored by limiting the duration of the injunction." Op. at 5.

26. The Debtors' "leverage" argument proceeds from two additional premises. First, the Debtors assume that CEC will lose the guarantee actions. They repeatedly assert that termination of the injunction will result in a judgment against CEC. Mot. ¶¶ 14, 28, 30, 39. While WSFS is confident it will prevail, victory is not preordained. But the Debtors' assumption of a CEC loss raises the troubling question of why the Trustees are not compensated for valid claims in the Plan (which wipes out all third-party claims against CEC for no consideration)?

27. Second, citing the Court's order from last February, which was based upon testimony given in June 2015 (fourteen months ago), the Debtors assert that "[t]here is no dispute

that CEC cannot pay" judgments in favor of the Trustees and that, if judgments were entered, "CEC would end up in a bankruptcy case of its own."  Mot. ¶ 30.  The Debtors claim "[t]hat remains true today."  *Id.*  In fact, however, there is substantial dispute over CEC's ability to pay.  As the Debtors note elsewhere, they "have outperformed their budget while in chapter 11" and CEC's affiliate, CAC, has agreed to sell its "social mobile gaming business for $4.4 billion in cash."  *Id.* ¶¶ 6, 7.  These developments have increased enterprise value to the point where it is possible that the Debtors and CEC could pay all of their obligations, including the guarantee claims, in full.  The high end of the valuation range set forth in the Disclosure Statement results in value above the "$18 billion capital structure" described in the Motion, and the Debtors' counsel has asserted that "collectability" of estate claims is "no longer expected to be an issue."

28.     Moreover, as demonstrated in June, the Debtors unreasonably focused on CEC as the only defendant whose assets matter in connection with enforcement of estate claims, while proposing to release and exonerate literally dozens of other wrongdoers without any compensation at all.  That this was a grievous error is demonstrated by the complaint filed last week in response to the Noteholder Committee's standing motion, in which the Debtors named sixty-six defendants in addition to CEC.  As the Court observed on Wednesday, every single one of those defendants would be released without contributing "so much as a dime under the plan."  The record provides no basis for concluding that the guarantee actions impair the Debtors' ability to obtain full relief in the litigation they just commenced.  At most, it supports the unremarkable proposition that one defendant (CEC) may lack financial resources to bear the liability of sixty-six other defendants if it is called upon to address its other liabilities.

29.     Finally, as the Court found in June, "CEC might have alternatives to bankruptcy" and, even if it did file, "a CEC bankruptcy might only delay confirmation of a CEOC plan."  Op.

- 11 -

at 4.  The Debtors' dire (and stale) pronouncements notwithstanding, there is no credible evidence that a judgment against CEC would derail this bankruptcy case.

30. The premise of the Court's order was that "the debtors' progress on the settlement front [wa]s enough to show a continued likelihood of a successful reorganization – *in the sense of a fully consensual plan*, the debtors' goal." *Id.* (emphasis added).  There has been no material progress towards a "fully consensual plan" since that time, and there is no basis for further relief.

### III.   THE EQUITIES DO NOT FAVOR THE DEBTORS

31. The Debtors continue to insist that the Court need not consider harm to the Trustees or otherwise balance the equities.  Mot. ¶ 36.  They are wrong.  "A Section 105 injunction is an equitable remedy.  To receive equity, . . . one must do equity."  8/17/16 Tr. at 22:5-6; *see* Op. at 5-6 (balancing the equities); ECF 214 ("Feb. Op.") at 15-17 (same).

32. The equities matter, and the burden is on the Debtors.  As the Court observed, "[n]ext week, the debtors might well want to show – if it can be shown – what is equitable about stopping guaranty plaintiffs from enforcing their contractual rights in order to let the debtors confirm a plan under which alleged wrongdoers are released for free."  8/17/16 Tr. at 22:6-11.  The Debtors cannot meet this burden and the equities do not favor extension of the injunction.

33. The Debtors have had ample opportunity to strike a deal.  They frittered away the breathing period afforded by the Court, focusing on the ineffective Second Lien RSA (an agreement entirely among shareholders of CEC and CAC) and pursuing objections and avoidance actions respecting the Second Lien Notes.  They continue to seek cramdown of billions of dollars of Second Lien Notes in order to wipe out concededly meritorious guarantee claims against a non-debtor (CEC) for no consideration.  At the same time, they would release the dozens of other defendants – many of whom are highly solvent – who could contribute to the reorganization but have not been asked to do so.  Put another way, that the Debtors decided to

settle the estate claims solely for promises by the one defendant (out of sixty-seven) that also was liable on the guarantees is not a reason to enjoin enforcement of the guarantees.

34. All the while, CEC continued to lobby for amendment of the Trust Indenture Act in an effort to impair the Trustees' guarantee claims. Discovery has revealed that CEC's lobbyists have been hard at work for a year, including during the injunction period, meeting with no less than forty Senators and Members of Congress and their staff.[5] Marc Rowan of Apollo personally met with Representatives Waters and McCarthy for a half hour each. And CEC has been free to transfer assets and engage in maneuvering similar to that which landed the Debtors in bankruptcy in the first place.[6]

35. Conversely, an injunction inequitably forces the Trustees to litigate with one hand tied behind the back, fending off the cramdown, claim objections and preference action without being able to establish their independent contractual rights against CEC. The Trustees risk an amendment of the Trust Indenture Act that impairs those rights. And the Trustees will incur very large costs – both time and money – preparing for the upcoming summary judgment hearings, which will again be delayed if the Court grants the requested relief.[7] Similarly, Judges in New

---

[5] CEC's head lobbyist testified at deposition on Wednesday that, off the top of his head, he recalled meeting or speaking with "almost every republican member of the House Financial Services Committee, senior members of the House Financial Services Appropriations, folks in the speaker['s office], [and] . . . Boehner, Ryan, McCarthy, Scalise; then a significant number similar in the senate and some folk on the transportation committees, both the [appropriations] and . . . the commerce committee . . . , Senator McConnell . . . ; and talked to, ironic for me, Senator Reid's office a significant number of times."

[6] WSFS renews its request that any further injunction be conditioned on prohibitions of CEC's ability to transfer and dissipate assets (including proceeds from the announced sale of Caesars Interactive Entertainment) outside of the ordinary course of business. *See, e.g.*, *In re Lyondell Chem. Co.*, 402 B.R. 571, 595 (Bankr. S.D.N.Y. 2009).

[7] The public interest also weighs against a further injunction. *See, e.g.*, *Lyondell*, 402 B.R. at 593 ("guaranties are an important device in commercial transactions, and . . . as a matter of public policy their enforcement should not be limited") and 594 ("Another public interest

York and Delaware (who have been asked to rearrange their calendars twice already) will be inconvenienced as well.

## IV. NO INJUNCTION MAY RUN THROUGH CONFIRMATION

36. Finally, the Debtors insist that the Court should issue an injunction that runs through confirmation regardless of the prospect of a consensual resolution. Mot. ¶¶ 24-26.[8] Even if further relief was warranted (it is not), there is no basis for an injunction of that length.

37. The premise of the Court's prior injunctions, and the Seventh Circuit's earlier ruling, was to give the Debtors a short and temporary respite in which to seek and reach consensus. *BOKF*, 808 F.3d at 1189 ("CEOC contends that if the guaranty litigation against CEC can be frozen for a time by an order issued by the bankruptcy judge, the bankruptcy examiner's report analyzing the disputed transactions will provide the parties with information they need to have a clear shot at negotiating an overall settlement"); ECF 214 ("Feb. Op.") at 16 (The guarantee actions "will merely be delayed for a brief period after the examiner submits his initial report. If there has been no resolution of the bankruptcy and the injunction expires, [the Trustees] will be free to pursue their actions."); Tr. 6/15/16 at 15:1-3 ("[T]he premise of the injunction was to gain time to talk settlement and reach one. You have got that time. Use it.").

38. The Debtors have had the benefits of an injunction for six months. Their request to turn what was intended to be a short stay into a permanent bar contradicts the reason why the

---

concern arises from the potential for the unequal treatment of creditors similarly situated – as, for example, might result if the defendants here were enjoined, but other unpaid . . . creditors [of the guarantor] were free to pursue remedies.").

[8] The Debtors even imply that a failure to issue their requested injunction "would resurrect[] the very 'cramped interpretation' [of section 105] that the Seventh Circuit rejected." Mot. ¶ 10. As the Court well knows, injunctive relief is discretionary, *Goodman, D.C. v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005), and the Seventh Circuit made clear that issuance of the injunction is "an issue for the bankruptcy judge to resolve in the first instance," *BOKF*, 808 F.3d at 1191.

injunction was entered in the first place. And there is no authority for an injunction through plan confirmation. Rather, the cases involve *temporary* stays. *In re Teknek, LLC*, 563 F.3d 639, 648 (7th Cir. 2009) ("the trustee may temporarily block claims that are not property of the estate"); *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) (same); *In re Gander Partners LLC*, 432 B.R. 781, 788-89 (Bankr. N.D. Ill. 2010) (limiting injunction to 120 days); *In re IFC Credit Corp.*, 422 B.R. 659, 664-65 (Bankr. N.D. Ill. 2010) (limiting injunction to 90 days). In those cases, creditors did not permanently lose their claims, and instead retained the right to litigate after the injunction was lifted.

39. In contrast, the cases cited by the Debtors involved plans that would pay the enjoined creditor *in full*, thus justifying a stay to enable other creditors to benefit from additional value to be provided by the non-debtor. *In re Fabtech Indus.*, No. CC-10-1144-HPaD, 2010 WL 6452908, *2 (9th Cir. BAP July 19, 2010); *In re Otero Mills*, 21 B.R. 777, 779 (Bankr. D.N.M. 1982); *see In re Juneau's Bldg. Ctr.*, 57 B.R. 254, 257 (Bankr. M.D. La. 1986) (*Otero* a "quintessential example" of a case where "collection against the third party should be stayed because the principal obligor (the debtor) will pay the obligation through the plan"). They also provided for the injunction to terminate if the creditor's claim would not be fully paid. *Fabtech*, 2010 WL 6452908 at *2 n.4; *Otero*, 21 B.R. at 780. As the Debtors do not propose to pay the Second Lien Notes in full, their authority is inapposite.

## V.   CONCLUSION

There is no basis to enjoin the guarantee actions any longer. The Court should enforce the deadline established in its prior order and deny the Motion. If the Court concludes that an extension is warranted, the new injunction should be short (no longer than the thirty days Mr. Hayes said was needed to reach a deal) and accompanied by a concurrent extension of all dates and deadlines associated with confirmation of the Plan.

Dated:  August 19, 2016

          JONES DAY

          By:  /s/ Timothy W. Hoffmann
          Timothy W. Hoffmann
          77 West Wacker Drive
          Chicago, IL 60601

          Bruce Bennett
          James O. Johnston
          Sidney P. Levinson
          Joshua M. Mester
          555 South Flower Street
          50th Floor
          Los Angeles, CA  90071

          Geoff Stewart
          51 Louisiana Avenue, N.W.
          Washington, D.C.  20001-2113

          -and-

          KELLEY DRYE & WARREN LLP
          Eric R. Wilson
          David I. Zalman
          101 Park Avenue
          New York, NY  10178

          *Attorneys for Defendant,*
          *Wilmington Savings Fund Society, FSB*